**ASPEN ADVISORS LLC, Heartland Capital Corp. and Heartland Capital Corp. Pension Plan & Trust, Plaintiffs Below, Appellants,**

v.

**UNITED ARTISTS THEATRE COMPANY, Regal Entertainment Group, Anschutz Investment Group LLC, the Anschutz Corporation, Anschutz Investment Fund L.P. Uams, Inc., and Philip F. Anschutz, Defendants Below, Appellees.**

No. 52, 2004.

Supreme Court of Delaware.

Submitted: Sept. 8, 2004.
Decided: Nov. 23, 2004.

---

**22.** *Desmond v. State*, 654 A.2d 821, 829 (Del. 1994).

Pamela S. Tikellis, Robert J. Kriner, Jr. (argued) and A. Zachary Naylor, Chimicles & Tikellis, Wilmington, DE, and Michael J. Freed, Much Shelist Freed Denenberg Ament & Rubenstein, P.C., Chicago, IL, for appellants.

William M. Lafferty (argued), Frederick H. Alexander and Susan D. Wood, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, and Christopher J. Walsh and Andrew R. Shoemaker, Hogan & Hartson, L.L.P., Denver, CO, for appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices (constituting the Court en Banc).

HOLLAND, Justice:

This is an appeal from a final judgment of the Court of Chancery, dismissing the Amended Complaint of the plaintiffs-appellants, Aspen Advisors LLC, Heartland Capital Corp., and Heartland Capital Corp. Purchase Pension Plan and Trust. The plaintiffs are holders of Warrants to purchase Common Stock of United Artists Theatre Company for $10 per share ("Warrants"). The Amended Complaint asserts three counts for breaches of the express and implied terms of the Warrants against the defendant, United Artists Theatre Company ("United Artists"), and for tortious interference with the Warrants against Philip Anschutz and various entities he controlled. The other defendants in this action are Philip F. Anschutz and several entities controlled directly or indirectly by him.

For identification purposes, the Court of Chancery divided Anschutz's entities into two basic groups. The first group, the "UA Holders," comprises those companies that were the original entities through which Anschutz held his interests in United Artists. The second group, the "Other Theatre Companies," consists of those entities through which Anschutz held his interests in Regal Cinemas, Inc. and certain other theatre companies. We have adhered to those designations in this opinion.

In the Amended Complaint, the plaintiffs attempted to plead claims relating to the merger in which the minority stockholders of United Artists were cashed out, pursuant to Del.Code Ann. tit. 8, § 253 (the "Merger"). First, plaintiffs allege that United Artists violated the implied covenant of good faith and fair dealing in

the Warrants by failing to allow them to participate in a separate Exchange Agreement that predated the Merger, an agreement to which United Artists was not a party. Second, plaintiffs allege that United Artists breached the express terms of an anti-destruction provision in Section 2(c) of the Warrants by providing them with only the same merger consideration received by the minority stockholders of United Artists in the Merger, but failing to provide them with an independent right to seek a determination of the "fair value" of their Warrants. Third, plaintiffs allege that the non-United Artists defendants tortiously interfered with plaintiffs' contractual rights under the Warrants.

We have decided that the Court of Chancery properly dismissed plaintiffs' first claim that United Artists breached the implied covenant of good faith and fair dealing by failing to allow plaintiffs to sell their Warrants under an Exchange Agreement to which United Artists was not even a party. The Court of Chancery correctly concluded that "the warrants held by the plaintiffs gave them no explicit or interstitial right to participate in these exchanges."[1] The Court of Chancery also properly dismissed plaintiffs' second claim that United Artists breached the anti-destruction clause in Section 2(c) of the Warrants by providing them with only the same merger consideration paid to the minority stockholders of United Artists in the Merger, without also providing them an independent right to seek a determination of the "fair value" of their Warrants.

The Court of Chancery dismissed plaintiffs' third claim that alleged tortious interference with Section 2(c) of the Warrant Agreement. It did so based on its prior determination that the plaintiffs' second claim had failed to state a cause of action for breach of the Warrants, a necessary element of a claim for tortious interference with a contract under Delaware law. In view of our holding affirming the Court of Chancery's conclusion that the plaintiffs' second claim is without merit, the dismissal of the plaintiffs' third claim must also be affirmed.

## FACTS[2]

### UA Holders' Investment in United Artists

In 1999, United Artists became unable to service its debt. The next year, its senior creditors under a $450 million loan facility declared a default and blocked United Artists from making payments to holders of the company's subordinated notes. Negotiations then ensued between United Artists and the senior creditors. In that process, the Anschutz-controlled UA Holders acquired nearly $100 million worth of the claims under the loan facility. That process also resulted in an agreement between United Artists and the senior creditors on a restructuring of United Artists.

Following that development, the UA Holders took the lead in negotiating with the subordinated noteholders and other subordinated creditors. These negotiations were not successful, and the subordinated noteholders filed an involuntary bankruptcy petition on behalf of United Artists. The bankruptcy filing inspired further negotiations which resulted in an agreement to allocate to the subordinated creditors 7% of the fully diluted equity of

**1.** *Aspen Advisors LLC v. United Artists Theatre Co.,* 843 A.2d 697, 699 (Del.Ch.2004).

**2.** The operative facts are not in dispute. Therefore, the recitation of facts in this opinion is taken almost verbatim from the decision of the Court of Chancery. *Aspen Advisors LLC v. United Artists Theatre Co.,* 843 A.2d 697 (Del.Ch.2004).

United Artists in the form of "Warrants" exercisable into United Artists common stock. The Warrants had a seven-year term and a strike price of $10 per share, and were covered by an anti-destruction clause that is the focal point of the present litigation.

Under the overall restructuring plan as implemented, United Artists' capital structure consisted of the following classes of securities:

- Common stock: 10,000,000 shares of common stock;

- Preferred stock: 9,120,000 shares of preferred stock convertible into common shares at a conversion price of $6.25 per share:

- Warrants: 5,600,000 Warrants to acquire common stock at a strike price of $10.00 per share;

- Stock options: 2,746,666 options to be distributed according to the management stock option plan.

Of this allocation, the UA Holders received 20% of the common stock (2 million shares), 100% of the preferred shares (9.12 million shares), and 67% of the Warrants (3.75 million Warrants). The remainder of the common stock went to other former senior lenders of United Artists.

The remainder of the Warrants went to former subordinated lenders (including noteholders) of United Artists, a class that included the plaintiffs in this action. According to the plaintiffs, they and other subordinated creditors took comfort in the fact that the Warrants they received were identical to those received by the UA Holders, thereby guaranteeing that the plaintiffs' Warrants would receive the same protection as Anschutz had secured for himself.

## Warrantholders' Key Protections

Before exercising their Warrants, the plaintiffs and other Warrantholders, as a matter of law, did not possess nor could they exercise any rights as stockholders of United Artists. Although the Warrants had a seven-year term, the equity element of the Warrants could lapse before the expiration of that term in certain circumstances, such as the occurrence of a merger. In such circumstances, the Warrantholders were protected by a standard "anti-destruction" provision, which states in pertinent part:

> In case of any reclassification or change of the outstanding securities of the Company or of any reorganization of the Company (or any other corporation the stock or securities of which are at the time receivable upon the exercise of this Warrant) or any similar corporate reorganization on or after the date hereof, then and in each such case, the Registered Holder of this Warrant, upon the exercise hereof at any time after the consummation of such reclassification, change, reorganization, merger or conveyance, shall be entitled to receive, in lieu of the shares or other securities and property receivable upon the exercise hereof prior to such consummation, the shares or other securities or property to which such holder would have been entitled upon such consummation if such holder had exercised this Warrant immediately prior thereto .... [3]

In connection with the restructuring, the equity-holders in the restructured United Artists were required to enter into a "Stockholders Agreement," to which the Warrantholders would become bound in the event they exercised the Warrants.[4] Under that Stockholders Agreement, the

---

3. Warrants § 2(c).

4. *Id.* § 3(b); Stockholders Agreement, at 2.

stockholders had the "right and the obligation to participate" in any "Change of Control" transaction. The term "Change of Control" was defined as:

> any transaction (whether by merger, consolidation, sale of assets or otherwise), or series of related transactions within a six (6) month period, pursuant to which [the particular Anschutz-controlled entity that was then the controlling stockholder of United Artists] and its Affiliates (as a group) cease to Beneficially Own at least 25% of the issued and outstanding shares of capital stock of the Company having the right to vote (in the aggregate).

The term "Affiliate" was broadly defined in the Stockholders Agreement and encompassed any of the UA Holders, or any other entity controlled, directly or indirectly, by the UA Holders or Anschutz himself.

### Anschutz Theatre Holdings Consolidated

In 2000 and 2001, Anschutz acquired controlling positions in three other companies in the same general business as United Artists: Regal Cinemas, Inc., Edward Theatres, Inc., and New Generation Network, Inc. Each of these companies was financially troubled and Anschutz gained his stake as part of their restructurings. Anschutz later exchanged his controlling stake in New Generation Network for 100% of the equity of Regal CineMedia, Inc. The Court of Chancery defined these entities, which Anschutz used to hold the equity positions he acquired in these transactions as the "Other Theatre Companies."

By 2002, Anschutz decided to consolidate the Other Theatre Companies with his holdings in United Artists and have them held by a single holding company, Regal Entertainment Group, which would become a public company with other inves-

tors. To accomplish this consolidation, Regal Entertainment, the UA Holders, the Other Theatre Companies, and certain others entered into an "Exchange Agreement." United Artists was not a party to the Exchange Agreement.

Under the Exchange Agreement, United Artists equity and Warrants held by the UA Holders and a key officer of United Artists (Craig Slater), as well as the United Artists management options held by certain holders, were exchanged for equity, warrants and options in Regal Entertainment at the rate of 1.1265 Regal Entertainment shares, warrants, or options for each United Artists share, Warrant, or option. The Exchange Agreement also provided for the exchange of additional United Artists equity or Warrants if the UA Holders or Slater acquired any such equity or Warrants before the Initial Public Offering ("IPO") of Regal Entertainment's stock.

In April and May 2002, Regal Entertainment had acquired all of the United Artists equity held by the UA Holders and Slater, thereby gaining an equity position that had been enhanced by purchases of additional equity made by the UA Holders. These purchases left Regal Entertainment owning slightly over 90% of United Artists' common stock, because the UA Holders by that time had acquired control of 8.1 million shares of United Artists' common stock and had already owned (and converted into common stock) all of the preferred stock of United Artists. In addition, Regal Entertainment had acquired all of the UA Holders' 3.75 million Warrants.

The Exchange Agreement also contemplated that Regal Entertainment would exchange equity in itself for equity of the Other Theatre Companies, so that Regal Entertainment would own a controlling block in not only United Artists, but also Regal Cinemas, Regal CineMedia, and Ed-

wards Theatres. These exchanges were also consummated by May 2002.

By exchanging all of his movie theatre holdings with Regal Entertainment in return for equity in that new entity, Anschutz was able to retain a majority interest in Regal Entertainment. Therefore, as the plaintiffs state in their complaint, by virtue of his control of Regal Entertainment, Anschutz continued at all relevant times to control United Artists.

The Regal Entertainment IPO proceeded contemporaneously with the transactions contemplated by the Exchange Agreement. In May 2002, 18 million Regal Entertainment shares were sold at $19 per share in the IPO. The Amended Complaint quotes the IPO prospectus as telling prospective investors that, among other things:

- "Our nationwide theatre circuit, comprising Regal Cinemas Corporation, United Artists Theatre Company and Edwards Theatres, Inc., operates 5,886 screens in 561 theaters in 36 states."
- "We believe that significant opportunities exist for us to generate economies of scale from the integration of Regal Cinemas, United Artists and Edwards Theatres. We expect to enhance our operating results through the application of best practices from across our combined company."
- "[A] portion of the net proceeds of this offering will be used to repay $240.6 million of outstanding senior indebtedness of United Artists . . . ."
- "Regal Cinemas, United Artists and Edwards Theatres operated as separate motion picture exhibitors until we acquired them . . . ."
- "[W]e are recording the combination of Regal Cinemas, United Artists and Edwards Theatres in accordance with

the purchase method of accounting. . . ."

- "We have combined three independent motion picture exhibitors and Regal CineMedia into a new company . . . ."

The Court of Chancery summarized the IPO prospectus as indicating that Regal Entertainment would operate the formerly separate movie theatre businesses of United Artists, Regal Cinemas, Regal CineMedia, and Edwards Theatres as an integrated business under common management and with a shared strategic focus.

### Short–Form Merger Under Section 253

In August 2002, Regal Entertainment, through a wholly owned subsidiary, used its ownership of over 90% of United Artists' shares to effect a short-form merger under Del.Code Ann. tit. 8, § 253 (the aforementioned "Merger"). In the Merger, each outstanding publicly owned share of United Artists' stock was converted into the right to receive $14.00 in cash. Common stockholders were also afforded notice of their opportunity to seek appraisal under Del.Code Ann. tit. 8, § 262.

Within days of the Merger, the plaintiffs and other Warrantholders were informed that the Merger had occurred and the plaintiffs were advised by letter that:

Accordingly, pursuant to Section 2(c) of each Warrant, each Warrant held by you immediately prior to the Effective Time is no longer exercisable into Shares, but is now only exercisable into the difference between the Merger Consideration and the "Purchase Price" set forth in such Warrant multiplied by the number of Shares represented by such Warrant. At such time as you elect to exercise your Warrant(s), please follow the instructions for exercise set forth in Section 1 of your warrant Certificate(s).

## Procedural Background

The plaintiffs filed their original complaint in this action against United Artists, Regal, AIG, TAC, UAMS, and certain present or former directors of United Artists, including Mr. Anschutz. The original complaint attempted to plead a claim for damages arising from the Merger on the grounds that (1) United Artists purportedly breached section 2(c) of the Warrants; (2) United Artists purportedly breached an implied covenant of good faith that inhered in the Warrants; and (3) certain defendants breached fiduciary duties purportedly owed to the Warrantholders. Thereafter, the defendants moved to dismiss the original complaint, pursuant to Court of Chancery Rule 12(b)(6).

In response to the defendants' motion to dismiss, the plaintiffs filed an Amended Complaint as well as an answering brief in opposition to the defendants' motion to dismiss. The Amended Complaint named as defendants: United Artists, Regal, AIG, TAC, AIF, UAMS, and Mr. Anschutz. The other present or former United Artists directors were dropped from the action. Like the original Complaint, the Amended Complaint attempted to plead claims for damages in connection with the Merger on the grounds that United Artists purportedly breached (1) section 2(c) of the Warrants and (2) an implied covenant of good faith that inhered in the Warrants. The Amended Complaint also alleged that the defendants, excluding United Artists, had tortiously interfered with plaintiffs' contractual rights under the Warrants. The plaintiffs, however, abandoned their fiduciary duty claims.

## Plaintiffs' Amended Complaint

The plaintiffs asserted two basic claims in the Amended Complaint. The first is that United Artists violated the covenant of good faith and fair dealing that inhered in the Warrants (as contracts) by engaging "in a merger structured effectively to reclassify identical interests in [United Artists] equity according to whether the interests were owned by favored insiders and to arrogate the true value of [United Artists] to selected owners of the identical equity interests." The plaintiffs contend that the Exchange Offer in which the UA Holders exchanged their equity interests in United Artists (including their Warrants) for equity interests in Regal Entertainment, was a *de facto* merger in which all Warrantholders should have had the opportunity to participate. In essence, the plaintiffs, as Warrantholders, contend that they should have had the same opportunity as the UA Holders to exchange their Warrants for Regal Entertainment warrants.

The plaintiffs' first claim is not predicated on any explicit term of the Warrants, but rather, as noted by the Court of Chancery, on the implied covenant of good faith and fair dealing. In a separate count, the plaintiffs allege that the remaining defendants (i.e., Anschutz and certain other companies he controls) tortiously interfered with the Warrants by excluding the plaintiffs from participating in the Exchange Agreement on equal terms with the UA Holders.

The plaintiffs' second claim is a variation of the first. The plaintiffs argue that the Warrantholders should have received consideration in the short-form Merger equivalent to "fair value" under Section 262. The plaintiffs submit that this right flows from Section 2(c) of the Warrant Agreement. The plaintiffs contend it is obvious that Section 2(c) was breached, because the $14 per share that United Artists offered the Warrantholders in the Merger is worth substantially less than what the UA Holders received from Regal Entertainment for their Warrants under the Exchange Agreement. This second contract

claim is pled directly against United Artists, and the remaining defendants are accused of having tortiously induced the breach of Section 2(c).

### Implied Covenant Not Breached

■ In this Court, as in the Court of Chancery, the plaintiffs argue that United Artists violated the implied covenant of good faith and fair dealing in the Warrant contract by failing to permit the plaintiffs to sell their Warrants under the Exchange Agreement. The plaintiffs acknowledge that this Court has held that "implying obligations based on the covenant of good faith and fair dealing is a cautious enterprise," and "those cases should be rare ...."[5] Nevertheless, in this appeal, the plaintiffs continue to argue that the defendants violated the implied covenant in the Warrants.

The plaintiffs contend that "the discriminatory two-step combination [of the Exchange Agreement and the Merger] frustrated [p]laintiffs' reasonable expectations under the Warrants while preserving the expectations of Anschutz with respect to identical Warrants." The theory of the plaintiffs' first claim on appeal is that the Court of Chancery erred in viewing the Exchange Agreement and the subsequent Merger as two separate and distinct transactions. As a result of that error, the plaintiffs submit that the Court of Chancery did not give due consideration to their claim that the "purportedly" two-step discriminatory scheme violated the implied covenant of good faith and fair dealing.

The Court of Chancery concluded that there was neither a factual nor a legal basis to support the plaintiffs' thesis that the Exchange Agreement was the "front end" of the Merger. The Court of Chancery determined that the Exchange Agreement was not "an essential step towards consummation of a § 253 merger involving United Artists."[6] That determination is supported by record evidence that the Exchange Agreement was consummated more than five months before the short-form merger.

As the Court of Chancery noted, "plaintiffs admit that Anschutz indirectly controlled United Artists before and after the Exchange Agreement."[7] The Court of Chancery recognized that "the Exchange Agreement was the vehicle by which Anschutz—as the ultimate owner of a majority of the equity of United Artists and the Other Theatre Companies—could place his control blocks in those companies in a single holding company that he intended to take public imminently."[8] However, as the Court of Chancery astutely observed, "[t]here is no reason to believe that Anschutz could not have come into control of over 90% of United Artists' equity through a vehicle other than Regal Entertainment in the absence of the Exchange Agreement."[9]

The Court of Chancery correctly held that "[b]y their plain terms, the Warrants gave the plaintiffs no right to participate in the Exchange Agreement."[10] The Court of Chancery also properly concluded that the Exchange Agreement did not trigger any of the Warrantholders' rights under

5. *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998).

6. *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 705 (Del.Ch.2004).

7. *Id.*

8. *Id.*

9. *Id.*

10. *Id.*

the specific language of the anti-destruction clause in § 2(c):

> The transactions effected under that Agreement did not reclassify or change the outstanding securities of United Artists, events that would have triggered § 2(c) of the Warrants. Nor was the Exchange Agreement a reorganization within the meaning of § 2(c). As a result of the Exchange Agreement itself and the transactions it contemplated, there was no change in the capital structure of United Artists that resulted in the substitution of other securities or property for the common stock of the company. Put otherwise, there was nothing—i.e., no shares or other securities or property—to which Warrantholders would have become "entitled" if they had exercised their Warrants and become common stockholders of United Artists immediately before the consummation of the Exchange Agreement. All that happened was that the UA Holders' holdings in United Artists (including their Warrants) were exchanged to Regal Entertainment—an entity that Anschutz also controlled.[11]

The Exchange Agreement permitted Regal Entertainment to announce that it had consolidated control of United Artists and the Other Theatre Companies, and to begin using that common control to achieve operating efficiencies. As the Court of Chancery noted, however, "that Agreement left the plaintiffs in the same position as they were in before: as Warrantholders in a company that was ultimately controlled by Anschutz who possessed the right to convert each of their Warrants into United Artists common stock at $10 per share for the remainder of the contract term subject only to the possibility of a merger or other transaction covered by § 2(c)."[12] That determination is supported by the record and is the product of a logical deductive process.[13]

The Court of Chancery concluded that "[b]ecause the Stockholders Agreement and the Warrants both contain provisions designed to protect the Warrantholders in the event of certain transactions—such as an actual merger or certain changes of control—but do not contain provisions that [were] implicated by the Exchange Agreement," plaintiffs' implied covenant claims "lacks merit."[14] The Court of Chancery reasoned as follows:

> The implied covenant is only breached when the defendant [has] engaged in "arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." When, as is the case here, the relevant contracts expressly grant the plaintiffs certain rights in the event of particular transactions (such as mergers and, if they had exercised their warrants, certain changes in control), the court cannot read the contracts as also including an implied covenant to grant the plaintiff additional unspecified rights in the event that other transactions are undertaken. To do so would be to grant the plaintiffs, by judicial fiat, contractual provisions that they failed to secure for themselves at the bargaining table. By specific words, the parties to the Stockholders Agreement and the Warrants identified particular transactions that would provide the Warrantholders with the right

---

11. *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 705–06 (Del.Ch.2004).

12. *Id.* at 706.

13. *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del. 1972).

14. *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d at 707.

to receive the same consideration paid to common stockholders (e.g., in mergers involving United Artists) and the right (if they had exercised their Warrants) to tag along (i.e., in certain change of control transactions). Similarly, the parties also (by omission) defined the freedom of action other parties to those contracts ... had to engage in transactions without triggering rights of that nature.[15]

The Court of Chancery recognized that the plaintiffs' claim for breach of the implied covenant of good faith and fair dealing can only be sustained "by narrowing the contractual freedom left to the other parties to the Stockholders Agreement and the Warrants."[16] The Court of Chancery concluded that: the Exchange Agreement was not the "front end" of the Merger; the Exchange Agreement did not trigger Section 2(c) of the Warrants; and the Exchange Agreement did not implicate any implied covenant of good faith and fair dealing to the Warrantholders. Therefore, we hold that the Court of Chancery properly granted the motion to dismiss Count I of the Amended Complaint.

### Warrants' Anti–Destruction Clause

■ In Count II of the Amended Complaint, the plaintiffs assert that the anti-destruction clause in Section 2(c) of the Warrants affords them the right to receive "fair value" in connection with the Merger. The resolution of this claim turns on the meaning of Section 2(c) in the Warrants, which provides:

In case of any reclassification or change of the outstanding securities of the Company or ... any reorganization of the company ... or any similar corporate

reorganization on or after the date hereof, then and in each such case, the Registered Holder of this Warrant, upon the exercise hereof at any time after the consummation of such reclassification, change, reorganization, merger or conveyance, shall be entitled to receive, in lieu of the shares or other securities and property receivable upon the exercise hereof prior to such consummation, the shares or other securities or property to which such holder would have been entitled upon such consummation if such holder had exercised this Warrant immediately prior thereto ...[17]

The Court of Chancery held that the "most obvious reading of the Warrants is that they grant Warrantholders the right to receive the same merger consideration that they would have received if they had converted immediately before the Merger. The 'property' that common stockholders of United Artists were entitled to under the Merger Agreement was $14 per share," and "[t]his is the same property that the plaintiffs would receive as Warrantholders, as § 2(c) contemplates."[18]

The plaintiffs rely upon this Court's opinion in *Continental Airlines*[19] to support their assertion that they are entitled under Section 2(c) to a determination of the "fair value" of their Warrants in connection with the Merger. In *Continental,* we held that a warrantholder (American General) had a contractual right to receive the "same fair price established in [the] post-merger proceedings" for its warrants that the stockholders had actually received as merger consideration:

---

15. *Id.*

16. *Id.*

17. Warrants § 2(c).

18. *Aspen Advisors LLC v. United Artists Theatre Co.,* 843 A.2d 697, 708 (Del.Ch.2004).

19. *Continental Airlines Corp. v. American General Corp.,* 575 A.2d 1160 (Del.1990).

Under [the anti-destruction clause] of the Warrants, American General is entitled to receive the same fair price established in post-merger proceedings as did the other Continental shareholders .... American General's right to the same fair price for its shares payable to other shareholders is based solely on its contractual rights under [the anti-destruction clause] .... [20]

In this case, there were no post merger proceedings and no common stockholder of United Artists received more than $14 per share in the Merger. Unlike the warrantholders in *Continental*, the plaintiffs did not contend that they should receive some higher price that some other common stockholders actually received as consideration in the Merger in post-merger proceedings. Nonetheless, the plaintiffs in this case argue that they are entitled to an award of "fair value" as judicially determined through a quasi-appraisal right analogous to a Section 262 proceeding.

In support of that argument, the plaintiffs submit that this Court should draw from our decision in *Continental* a "broad lesson which is that warrantholders who are entitled to receive the same *merger consideration* as common stockholders are thereby guaranteed *all* the *rights (contractual, statutory or common law)* that would have belonged to them had they actually converted their warrants into common stock before the merger." Accordingly, the plaintiffs contend that, because the statutory right to receive "fair value" through an appraisal proceeding was received by common stockholders of United Artists in connection with the Merger,

they have the right to receive "fair value" for their Warrants via a quasi appraisal proceeding. The foregoing argument was specifically considered and rejected by the Court of Chancery.

### Stockholder Rights Statutory

■ The Court of Chancery held that, while each stockholder of record of United Artists at the time of the Merger was entitled to statutory appraisal rights under Del.Code Ann. tit. 8, § 262 in connection with the Merger, the same cannot be said for Warrantholders, like the plaintiffs:

As a result of effecting a § 253 merger, United Artists—as the surviving company—exposed itself to the risk that some of its common stockholders would opt to forsake the merger consideration in favor of pursing a possibly higher (or possibly lower) "fair value" award under § 262. But this was a risk that the General Assembly imposed on United Artists and other companies effecting § 253 mergers, solely as to actual stockholders. Holders of unexercised warrants are not stockholders within the meaning of § 262 and do not have rights under that statute.[21]

The Court of Chancery properly held that a statutory appraisal remedy is a narrow statutory right that is available only to stockholders.[22]

■ A warrantholder is not a stockholder. Warrantholders have paid for an option. They have a choice: whether to take an investment risk or not. A warrantholder only becomes a shareholder by investing something of value that meets the exercise terms of the warrant.[23] The

---

**20.** *Id.* at 1168.

**21.** *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 709 (Del.Ch.2004).

**22.** *See Applebaum v. Avaya, Inc.*, 812 A.2d 880, 893 (Del.2002).

**23.** *See Harff v. Kerkorian*, 324 A.2d 215, 220 (Del.Ch.1974) (stating that "[a]ny bond, or any property, for that matter, is convertible into stock through the intermediate step of converting into cash," or convertible under other certain conditions), *aff'd in part and*

United States Supreme Court has recognized that a warrantholder's "rights are wholly contractual" and that a warrantholder " 'does not become a stockholder, by his contract, in equity any more than at law.' " [24] Just like convertible debentures—the holders of which are also not stockholders—the "convertibility feature" of warrants does not impart stockholder status unless and until the warrant is converted.[25] In fact, Section 10 of these Warrants expressly provides that Warrantholders "shall not have or exercise any rights by virtue hereof as a stockholder of the Company." [26]

■ A warrantholder is only entitled to the rights of a shareholder—including statutory appraisal rights—*after* they make an investment in the corporation in accordance with the terms of the warrant and thereby expose themselves to the risks that are incident to stock ownership. If these plaintiffs wanted to possess all of the statutory rights accorded to stockholders of a Delaware corporation—including the right to seek an appraisal in the context of a short-form merger—they would have had to exercise their Warrants and pay United Artists $10 per share. These Warrantholders did not take that economic risk. Therefore, the Court of Chancery properly determined that the Warrantholders "relegated themselves to the protections afforded them by the Warrants," which "do not include a silent, interstitial right to a remedy akin to statutory ap-

praisal, but lacking the key trade-off inherent in that legislative remedy, the required eschewal of the merger consideration." [27]

### *Warrant Rights Contractual*

■ Warrants are contractual entitlements. The exclusive rights and remedies of warrantholders must appear in the contractual provisions of the Warrants. Had the drafters intended for the Warrantholders to have an independent claim for fair value of the common stock following a merger, the Warrant could have said, for example, that: "upon a merger, the Warrantholders are entitled to receive the greater of the consideration received by stockholders in the merger or the fair value of the common stock." Had Section 2(c) been written with the intent of providing the Warrantholders with the right to a "fair value" determination in connection with a merger, it would have undoubtedly included specific procedures by which the Warrantholders could elect to forego the $14 per share Merger consideration and pursue a *contractually* agreed upon "fair value" *quasi*-appraisal right designed as the functional equivalent of a proceeding under Section 262.

These Warrantholders did not expressly contract for a quasi-appraisal right that would operate as the functional equivalent of a statutory Section 262 proceeding. The plaintiffs' request that we find such a right within the penumbra or interstices of the Warrant provisions was properly re-

---

*rev'd in part on the grounds,* 347 A.2d 133 (Del.1975).

**24.** *Helvering v. S.W. Consol. Corp.,* 315 U.S. 194, 200–01, 62 S.Ct. 546, 86 L.Ed. 789 (1942), *quoting Parkinson v. W. End St. Ry.,* 173 Mass. 446, 53 N.E. 891, 892 (1899). *Gamble v. Penn Valley Crude Oil Corp.,* 104 A.2d 257, 260 (Del.Ch.1954) (an option to buy stock in the future does not make one an equitable stockholder); 4 Fletcher Cyclopedia of Private Corp. § 1370 (2003) ("The law of

contracts applies to stock warrant agreements.").

**25.** *Simons v. Cogan,* 549 A.2d 300, 303 (Del. 1988).

**26.** Warrants § 10.

**27.** *Aspen Advisors LLC v. United Artists Theatre Co.,* 843 A.2d 697, 712 (Del.Ch.2004).

jected by the Court of Chancery, which held:

> To hold otherwise would inject great uncertainty on the part of issuers of Warrants, who commonly rely upon anti-destruction clauses identical in substance to § 2(c), by disrupting their settled expectations that these clauses would be interpreted in accordance with their plain terms . . . . [28]

The Court of Chancery followed this Court's precedents in recognizing that the only reason a common stockholder of United Artists had the right to seek "fair value" was through a statutory appraisal remedy by legislative mandate.[29]

### Continental Decided Contract Rights

Our holding in *Continental* did not suggest that American General, as a warrantholder, had the right to independently pursue claims to establish "fair value" analogous to those potentially available to stockholders either under a Del.Code Ann. tit. 8, § 262 appraisal action or under a breach of fiduciary theory.[30] Indeed, in *Continental*, we specifically rejected the argument that the anti-destruction clause granted American General a separate right to establish the fair value of the shares subject to the warrants, through litigation.[31] In response to American General's argument that "if it 'can establish, with respect to the stock . . . owned outright, that the fair value of Continental stock was considerably more than $16.50 per share, American General is also entitled to that higher consideration for the shares subject to its warrants,'" we held that "American General is entitled to receive only the same merger consideration that the employee-stockholders received,"[32] and that "American General's right to the same fair price for its shares payable to other shareholders is *based solely on its contractual right* under [the anti-destruction clause] . . . ."[33]

■ In *Continental*, when this Court held that a warrantholder had the contractual right to receive the "same fair price established in the post-merger proceedings," that holding was made in the context of a post-merger *class action* proceeding that had been filed and settled by certain stockholders.[34] In this case, if the common stockholders had received more than the original merger consideration ($14) as a result of post-merger *class action* proceedings, as occurred in *Continental*, the Warrantholders would be contractually entitled to receive that same higher amount pursuant to Section 2(c) in the Warrants. *Only stockholders*, however, have standing to bring a post-merger class action proceeding that may increase the

---

**28.** *Id.; see Elliott Assoc., L.P. v. Avatex Corp.,* 715 A.2d 843, 854–55 (Del.1998) (noting benefits of interpreting corporate instruments in a consistent and uniform manner). *Kaiser Aluminum Corp. v. Matheson,* 681 A.2d 392, 398 (Del.1996) (discussing need for uniformity in interpreting corporate instruments).

**29.** *See, e.g., Applebaum v. Avaya, Inc.,* 812 A.2d 880, 893 (Del.2002) (stating that "the right to an appraisal is a narrow statutory right"); *Alabama By–Products Corp. v. Neal,* 588 A.2d 255, 256 (Del.1991) (appraisal remedy is "entirely a creature of statute"); *Cede & Co. v. Technicolor, Inc.,* 542 A.2d 1182, 1186 (Del.1988). .

**30.** *Continental Airlines Corp. v. American General Corp.,* 575 A.2d 1160, 1168 (Del.1990) ("We emphasize that this holding *does not* rest on any notions of fiduciary duty.").

**31.** *Id.* at 1168 n. 8.

**32.** *Id.*

**33.** *Id.* at 1168 (emphasis added).

**34.** *Continental Airlines Corp. v. American General Corp.,* 575 A.2d at 1168.

amount of merger consideration. Any resulting increased amount would then be paid to both the stockholders and to the Warrantholders who contracted for an anti-destruction clause, such as Section 2(c) of these Warrants.

■ Absent fraud or illegality, appraisal is the exclusive remedy available to minority stockholders who object to a Section 253 short-form merger.[35] For the reasons stated in this opinion, however, any appraisal recovery would only accrue to the benefit of the shareholder who filed an appraisal action. In this case, there were no post-merger class action proceedings that increased the merger consideration paid to the stockholders. Since no stockholder received more than $14 per share as merger consideration, neither can these Warrantholders.

### Warrant Contract Defines Property

In addition to their claim that the Warrants implicitly provided the right to a quasi-appraisal proceeding, the plaintiffs argue, in the alternative, that such a right is a form of "property" under Section 2(c). In the context of the Warrant Contract, the word "property" follows the words "shares" and "securities," the latter two words being forms of consideration that are typically paid in a merger.

■ The well-established rule of construction, *ejusdem generis*, is that " 'where general language follows an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.' " [36] Section 2(c) unambiguously provides that the Warrantholders are to receive the same consideration in the Merger that they would have received had they exercised their Warrants before the Merger. In this case, that means the Warrantholders are entitled to receive $14 per share because that is the "property" received by the minority stockholders of United Artists in the Merger.

The minority stockholders' right option to forgo the Merger consideration and pursue an appraisal action was not a "property" right incident to the ownership of minority shares in the Merger for purposes of Section 2(c). Rather, that right was a statutory right—independent of any contract—that was conferred exclusively upon minority shareholders by Section 262 of the Delaware General Corporation Law.[37] The Court of Chancery properly concluded that United Artists fully complied with Section 2(c) of the Warrant contract by offering the plaintiffs the same "property" ($14 per share) that was paid to the common stockholders of United Artists in the Merger for each of their Warrants—less the $10 per Warrant exercise price. Accordingly, we hold that the Court of Chancery properly granted the motion to dismiss Count II of the Amended Complaint.

### Tortious Interference Properly Dismissed

■ The elements of a tortious interference claim are well established under

---

**35.** *Glassman v. Unocal Exploration Corp.,* 777 A.2d 242 (Del.2001).

**36.** *See Petition of State,* 708 A.2d 983, 988 (Del.1998) (quoting *Triple C Railcar Serv. v. Wilmington,* 630 A.2d 629, 631 (Del.1993)). *See also Sullivan Money Mgmt., Inc. v. FLS Holdings Inc.,* 1992 WL 345453, at *5–6 (Del.

Ch. Nov.20, 1992) (applying doctrine to corporate charter).

**37.** *See Applebaum v. Avaya, Inc.,* 812 A.2d 880, 893 (Del.2002) (noting that the "right to an appraisal [remedy] is a narrow statutory right").

Delaware law: "There must be (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury."[38] The Court of Chancery concluded that the plaintiffs' Amended Complaint failed to state a claim for breach of the Warrant contract. Accordingly, the Court of Chancery properly held that there could be no viable claim for tortious interference with the Warrant contract.[39] We agree. The Court of Chancery's dismissal of the tortious interference claim of the Amended Complaint was correct as a matter of law.

### Conclusion

The judgment of the Court of Chancery is affirmed.

---

**38.** *Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983, 992 (Del.Ch.1987).

**39.** *See Goldman v. Pogo.com, Inc.,* 2002 WL 1358760 at *8 (Del.Ch. June 14, 2002).