Healthcare Found. of Wilson v. DLP Healthcare, LLC, 2026 NCBC 57.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV033959-910

HEALTHCARE FOUNDATION OF
WILSON,

        Plaintiff,

v.

DLP HEALTHCARE, LLC; DLP
PARTNER, LLC; and DLP
WILSON HOLDING COMPANY,
LLC (nominal),

        Defendants.

**ORDER AND OPINION
ON MOTION TO DISMISS**

1. Wilson Holding Company, LLC ("Wilson Holding") owns and operates a hospital and ancillary medical facilities in Wilson, North Carolina. The company has just two members: Healthcare Foundation of Wilson ("Healthcare Foundation") and DLP Healthcare, LLC ("DLP Healthcare"). In 2024, Healthcare Foundation exercised a contractual put option that allows it to sell its entire membership interest to DLP Healthcare, which would make DLP Healthcare the sole owner of Wilson Holding. But the purchase process is in limbo due to disagreements about how to value Wilson Holding and Healthcare Foundation's stake in it. In this lawsuit, Healthcare Foundation asserts claims against DLP Healthcare and its parent company, DLP Partner, LLC ("DLP Partner"), for breach of contract, breach of fiduciary duty, and related wrongs.

2. DLP Healthcare and DLP Partner have moved to dismiss all claims under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. For the following reasons, the Court **GRANTS in part and DENIES in part** the motion.

*Womble Bond Dickinson (US) LLP, by Philip J. Mohr, A.J. Horner, and Wiley Bishop Hughes, for Plaintiff Healthcare Foundation of Wilson.*

*K&L Gates LLP, by Nathan Huff and Aaron Finkel, for Defendants DLP Healthcare, LLC and DLP Partner, LLC.*

*No counsel appeared for Nominal Defendant DLP Wilson Holding Company, LLC.*

Conrad, Judge.

## I.
## BACKGROUND

3. The Court does not make findings of fact on a Rule 12(b)(6) motion to dismiss. The following background takes as true the allegations in the amended complaint.

4. The Wilson Medical Center has a long history in Wilson, North Carolina. Founded in the 1960s, the hospital boasts nearly 300 beds and has served patients in practice areas ranging from imaging to surgery to emergency care. (*See* V. Am. Compl. ¶ 7, ECF No. 30.)

5. For most of its existence, the hospital was owned and operated by Healthcare Foundation (a North Carolina nonprofit corporation). That changed in 2013. Looking for help with improving patient services, Healthcare Foundation linked up with DLP Healthcare (a Delaware LLC) to form Wilson Holding (also a Delaware LLC) to take over the hospital's ownership and operations. (*See* V. Am. Compl. ¶¶ 1, 2, 4, 8, 9.)

6. Healthcare Foundation is Wilson Holding's minority member, with just a twenty-percent stake. DLP Healthcare holds the other eighty percent. When it comes to management, things are a bit more equal because Wilson Holding's operating

agreement vests authority in a ten-member governing board, half appointed by Healthcare Foundation and half appointed by DLP Healthcare. The governing board long ago delegated day-to-day managerial authority to DLP Partner, which is DLP Healthcare's parent company. Thus, as a practical matter, Healthcare Foundation can influence governance through its board appointments, but it has no say in day-to-day management and cannot unilaterally choose Wilson Holding's strategic direction. (*See* V. Am. Compl. ¶¶ 3, 4, 9–11, 25, 27; Op. Agrmt. § 9.1, ECF No. 29.1; *see also* Mgmt. Agrmt., ECF No. 29.3.)

7.     For added protection, Healthcare Foundation negotiated a separate put agreement that allows it to require DLP Healthcare to buy its minority interest in certain circumstances. The put agreement defines the purchase price as a percentage of Wilson Holding's appraised value, with the appraisal to be performed by a qualified appraiser selected by the governing board. Closing must take place no "later than sixty (60) days following the date" the final appraised value is issued, and "each party shall execute and deliver all such further documents and instruments and take all such further actions as may be necessary in order to consummate the" put transactions. (Put Agrmt. §§ 2, 4, 5, 7, ECF No. 29.2; *see also* V. Am. Compl. ¶ 25; Op. Agrmt. § 1.)

8.     As time went by, Healthcare Foundation lost faith in DLP Partner's management of the hospital. Especially worrisome were budget cuts, staff shortages, and a perceived decline in the quality of care. Although Healthcare Foundation proposed reforms, its efforts were frustrated by a divided governing board. So, in

August 2024, Healthcare Foundation exercised its put option and began the process of selling its minority interest to DLP Healthcare. (*See, e.g.*, V. Am. Compl. ¶¶ 29, 31, 34, 36.)

9. A few months later, Wilson Holding's governing board retained an appraiser called BDO to assess "the fair market value of a 100.0% interest" in Wilson Holding "as of a date to be determined (the 'Valuation Date')." The appraisal agreement contemplates a few months' worth of work in two phases. The deliverables for phase one include "financial schedules detailing preliminary valuation conclusions." The deliverable for phase two is "a full draft report." The appraisal agreement has a three-year term. (V. Am. Compl. ¶¶ 37, 38, 42; Ex. A, ECF No. 44.)

10. BDO started by requesting preliminary valuation information. In that request, it asked the parties to "confirm the date of valuation (the 'Valuation Date')" and noted "that all financial and market information will be leveraged as of the date of valuation." DLP Healthcare replied as follows: "Planning to use the period ending 12/31/2024 and provide [calendar year] 2024 financials once available later this month." As alleged, Healthcare Foundation agreed with the proposed valuation date and "conveyed its acceptance in the follow-up calls and communications held with BDO and DLP Healthcare representatives." Through these communications, Healthcare Foundation alleges, the parties formed a contract to use 31 December 2024 as the valuation date. Healthcare Foundation refers to this alleged contract as the Valuation Date Agreement. (V. Am. Compl. ¶¶ 45, 47–50; *see also* Prelim. Request Ex. B, ECF No. 45.)

11. Over the next six months, BDO gathered and assessed a great deal of financial information. It also met with and swapped emails with party representatives on a regular basis. Along the way, BDO produced two appraisal drafts for the parties' review, each time using 31 December 2024 as the valuation date. Although Healthcare Foundation and DLP Healthcare offered expansive feedback on both drafts, neither objected to the valuation date. (*See* V. Am. Compl. ¶¶ 51, 53, 55–57, 63–65, 69.)

12. When BDO produced its third draft in June 2025, the appraisal process broke down. In this nearly final draft, BDO tentatively assessed Wilson Holding's value at a figure approaching $300 million. DLP Healthcare strenuously objected and, for the first time in the appraisal process, stated that it opposed the use of 31 December 2024 as the valuation date. Healthcare Foundation, by contrast, urged BDO to finish its work and issue its final report. Then, in July 2025, DLP Partner stepped in as Wilson Holding's manager and instructed BDO not to issue the final appraisal. (*See* V. Am. Compl. ¶¶ 71, 72, 74, 76, 77, 85, 90, 91.)

13. Soon after, Healthcare Foundation brought this lawsuit. It alleges that BDO would have issued a final appraisal by the end of July 2025 and closing on the put option would have occurred by the end of September 2025 had DLP Partner not called a halt to the process. Moreover, BDO's appraisal allegedly would have entitled Healthcare Foundation to receive roughly $55 million for its minority interest. According to Healthcare Foundation, DLP Healthcare and DLP Partner were

unwilling to pay that amount and therefore reneged on the Valuation Date Agreement and halted the appraisal process. (*See* V. Am. Compl. ¶¶ 96, 100, 101.)

14. The amended complaint asserts a few direct claims and a few derivative claims on behalf of Wilson Holding. Listed in the order pleaded, the claims include the following: 1) a direct claim for breach of contract against DLP Healthcare; 2) a direct claim for breach of fiduciary duty against DLP Partner; 3) a direct claim for aiding and abetting breach of fiduciary duty against DLP Healthcare; 4) a derivative claim for breach of fiduciary duty against DLP Partner; 5) a derivative claim for tortious interference with contract against DLP Partner; and 6) a direct claim for breach of the implied covenant of good faith and fair dealing against DLP Healthcare. (*See, e.g.*, V. Am. Compl. ¶¶ 107, 109, 113, 119, 128, 143, 148, 155, 159, 163.)

15. DLP Healthcare and DLP Partner have moved to dismiss all claims against them. The motion is fully briefed, and the Court held a hearing on 14 May 2025. The motion is ripe for decision.

II.
LEGAL STANDARD

16. A Rule 12(b)(6) motion to dismiss "tests the legal sufficiency of the complaint." *Isenhour v. Hutto*, 350 N.C. 601, 604 (1999) (citation and quotation marks omitted). The motion should be granted only when "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citation and quotation marks omitted).

17. In deciding the motion, the Court must treat all well-pleaded allegations as true and view the facts and permissible inferences "in the light most favorable to" the nonmoving party. *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019) (citation and quotation marks omitted). However, the Court need not accept as true any "conclusions of law or unwarranted deductions of fact." *Wray v. City of Greensboro*, 370 N.C. 41, 46 (2017) (citation and quotation marks omitted). The Court may also "consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers," without converting the motion to a motion for summary judgment. *Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001).

III.
ANALYSIS

18. The Valuation Date Agreement is central to the amended complaint and the arguments supporting and opposing the motion to dismiss. Every asserted claim is premised at least in part on the allegation that Healthcare Foundation and DLP Healthcare formed a contract to use 31 December 2024 as the valuation date for the appraisal being performed by BDO. Although DLP Healthcare and DLP Partner seek dismissal on several grounds, they lean heavily on the argument that no such agreement exists and that, without it, no claim can survive. Thus, the Court begins with the Valuation Date Agreement and Healthcare Foundation's contract claims.

A. <u>Contract Claims</u>

19. Healthcare Foundation claims that DLP Healthcare breached the Valuation Date Agreement by renouncing their chosen valuation date. In addition, it claims that DLP Healthcare breached the put agreement and Wilson Holding's operating

agreement by encouraging or directing DLP Partner to instruct BDO not to issue the final appraisal. The same actions are also alleged to be breaches of the implied covenant of good faith and fair dealing in each contract.

20. Before turning to the parties' arguments, let's pause to clarify which State's law applies to these claims. Happily, the parties seem to be on the same page. They agree that North Carolina law governs the Valuation Date Agreement, including whether a contract was formed. And they agree that Delaware law governs the put agreement and the operating agreement because each has a Delaware choice-of-law clause. Having no reason to doubt the parties' consensus on either point, the Court will follow their lead. *See, e.g.*, *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 262 (1980) ("[W]here parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect."); *Fast v. Gulley*, 271 N.C. 208, 211 (1967) (noting the usual rule that "[m]atters bearing upon the execution, interpretation and validity of a contract are determined by the law of the place where it is made" (cleaned up)).

21. Under North Carolina law, the elements of a claim for breach of contract are the existence of a valid contract and a breach of that contract's terms. *See Poor v. Hill*, 138 N.C. App. 19, 26 (2000). When these elements are alleged, "it is error to dismiss a breach of contract claim under Rule 12(b)(6)." *Woolard v. Davenport*, 166 N.C. App. 129, 134 (2004).

22. Delaware law is similar. To state a claim, "the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of

an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

23. In moving to dismiss the contract claims, DLP Healthcare argues that the Valuation Date Agreement is not a valid contract because it lacks mutual assent.[1] According to DLP Healthcare, it did not make a contractual offer when it stated that it was "[p]lanning to use the period ending 12/31/2024" in response to BDO's preliminary request for information. Without an offer, DLP Healthcare contends, there could be no acceptance by Healthcare Foundation and, thus, no contract. And absent a Valuation Date Agreement, it continues, there could be no independent breach of the put agreement, the operating agreement, or the implied covenant.

24. It is true that mutual assent is essential to the formation of a contract. But "[w]hether mutual assent is established and whether a contract was intended between parties are questions for the trier of fact." *Snyder v. Freeman*, 300 N.C. 204, 217 (1980). At the pleading stage, the burden on Healthcare Foundation is light. It does not have to prove its case. It need only allege sufficient facts to put the opposing parties on notice of "the transactions, occurrences, or series of transactions or occurrences" that give rise to the claim. N.C. R. Civ. P. 8(a).

25. The amended complaint clears that "relatively low bar." *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *11 (N.C. Super. Ct. June 19, 2019).

---

[1] In its opening brief, DLP Healthcare also argues that no contract was formed due to a lack of consideration. But a mutual agreement to use a particular valuation date in lieu of all other possible dates satisfies the requirement of consideration for contract formation. *See, e.g.*, *Davis v. Woods*, 286 N.C. App. 547, 562 (2022) (defining consideration broadly to include any "benefit, right, or interest bestowed upon the promisor, or any forbearance, detriment, or loss undertaken by the promisee").

Neither the put agreement nor the appraisal agreement establishes a valuation date for the appraisal process. As alleged, though, choosing a valuation date was an essential precondition for BDO's work. The appraisal agreement makes this clear. So does BDO's preliminary request for information, which asked the parties to "confirm" the valuation date and stated that "all financial and market information will be leveraged as of the date of valuation." (Prelim. Request 1.) It was in this context that DLP Healthcare responded that 31 December 2024 would be the valuation date. The parties allegedly then had "follow-up calls and communications" in which Healthcare Foundation accepted DLP Healthcare's proposed date, thus forming the Valuation Date Agreement. (V. Am. Compl. ¶ 49.) What's more, the amended complaint alleges that Healthcare Foundation and DLP Healthcare repeatedly used 31 December 2024 as the valuation date in communications with each other and BDO for a period of roughly six months with no objections. (*See, e.g.*, V. Am. Compl. ¶¶ 51, 56, 56, 60, 68.)

26. The Court cannot conclude from these allegations that Healthcare Foundation "could prove no set of facts in support of its claim which would entitle it to relief." *Spring v. Lawson*, 2026 NCBC LEXIS 97, at *20–21 (N.C. Super. Ct. Apr. 27, 2026) (cleaned up). Taken as true and construed in the light most favorable to Healthcare Foundation, the allegations show that the parties mutually assented to use 31 December 2024 as the valuation date. Accordingly, the Court concludes that Healthcare Foundation has sufficiently alleged the existence of a valid contract and a breach of its terms. *See Lannan v. Bd. of Gov. of Univ. of N.C.*, 285 N.C. App. 574,

599 (2022) (affirming denial of motion to dismiss and stating that "[a]lthough the allegation of the meeting of the minds is sufficient at this stage, ultimately whether there was a meeting of the minds is a question for the trier of fact").

27. DLP Healthcare's remaining arguments as to these claims are scattershot. It contends, for example, that Healthcare Foundation failed to allege that the conditions precedent to the exercise of the put option were satisfied. This argument comes nowhere near the mark. As Healthcare Foundation correctly points out, it had the right to exercise the put option upon the tenth anniversary of the put agreement and timely did so. (*See* Put Agrmt. § 2.)

28. Next, DLP Healthcare argues that the put agreement does not govern the appraisal process, so that renouncing the chosen valuation date and causing BDO to withhold its final appraisal are not breaches of the put agreement. Again, the Court cannot conclude that Healthcare Foundation could prove no set of facts that would entitle it to relief. Taken as true, the allegations tend to show that DLP Healthcare took steps to delay or avoid purchasing Healthcare Foundation's interest, contrary to the requirement to "take all such further actions as may be necessary in order to consummate the" transaction. (Put Agrmt. § 7; *see also, e.g.*, V. Am. Compl. ¶ 157.)

29. DLP Healthcare also argues that the amended complaint does not allege a breach of the operating agreement. What is alleged, though, is that DLP Healthcare used its influence as an affiliate of DLP Partner to meddle in Wilson Holding's management even though the operating agreement prohibits the members from participating in management. (*See, e.g.*, Am. Compl. ¶¶ 3, 51, 91, 96 (alleging that

DLP Healthcare and DLP Partner were jointly represented by officials from their common parent company).) Discovery may show that DLP Healthcare lacks that influence or did not meddle. But the allegations, taken as true, are sufficient to state a claim under a notice-pleading standard.

30. Last, DLP Healthcare argues that the claim for breach of the implied covenant does nothing more than recapitulate the claim for breach of contract. "The implied covenant, inherent in all agreements, ensures that the parties deal honestly and fairly with each other when addressing gaps in their agreement." *Glaxo Grp. Ltd. v. Drit LP*, 248 A.3d 911, 919 (Del. 2021). Although a claim for breach of the implied covenant is "rarely invoked successfully" under Delaware law, the courts of that State have cautioned against dismissing even "doubtful" claims when factual uncertainty exists at the pleading stage. *Wnyh, LLC v. AccuMED Corp.*, 2018 Del. Ch. LEXIS 173, at *19–20 (Del. Ch. May 31, 2018) (citation and quotation marks omitted). Such is the case here. Given the uncertainty surrounding the Valuation Date Agreement and the disputed facts related to the alleged breaches, it would be "premature to address the possible relevance of the implied covenant" to Healthcare Foundation's claims. *Id.* at *20.

31. Accordingly, the Court denies the motion to dismiss the claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

## B. Fiduciary Claims

32. The amended complaint includes direct and derivative claims against DLP Partner for breach of fiduciary duty, as well as a direct claim against DLP Healthcare

for aiding and abetting a breach of fiduciary duty. As Wilson Holding's manager, DLP Partner is alleged to owe fiduciary duties to Wilson Holding and its members. DLP Partner supposedly breached these duties when it directed BDO not to issue the final appraisal, thus promoting DLP Healthcare's interests over Healthcare Foundation's. As alleged, DLP Healthcare encouraged DLP Partner to halt the appraisal, thus aiding and abetting the breach.

33. Again, the parties seem to be on the same page as to which State's law applies to these claims. Because Wilson Holding is a Delaware company, Delaware law governs its internal affairs, including the fiduciary obligations of its manager. *See Bluebird Corp. v. Aubin,* 188 N.C. App. 671, 680 (2008) (discussing "internal affairs doctrine").

34. To state a claim for breach of fiduciary duty under Delaware law, a plaintiff must allege "(1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. Apr. 23, 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010). For an aiding and abetting claim, the plaintiff must allege "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 389 (Del. 2024) (cleaned up).

35. DLP Partner does not dispute in this motion that it owes fiduciary duties to Wilson Holding and its members. Rather, it argues that it did not favor DLP Healthcare over Healthcare Foundation—and therefore did not breach its fiduciary

duties—by directing BDO to withhold the final appraisal. Pausing the appraisal process, it contends, was a neutral decision meant to give Wilson Holding's members time to work out their disagreement about the appropriate valuation date to use for the appraisal.

36. This argument lacks force because it presumes that the Valuation Date Agreement does not exist. The amended complaint adequately alleges not only that such an agreement exists (as discussed above) but also that DLP Partner knew about it and directed BDO not to issue the final appraisal once it became clear that Healthcare Foundation's membership interest was worth far more than DLP Healthcare wanted to pay. (*See* V. Am. Compl. ¶¶ 97, 128.) As alleged, millions of dollars ride on the choice of valuation date. (*See* V. Am. Compl. ¶¶ 101, 103.) The amended complaint adequately alleges that DLP Healthcare stood to benefit from DLP Partner's interference at Healthcare Foundation's expense and that DLP Partner also stood to benefit indirectly as DLP Healthcare's parent. (*See* V. Am. Compl. ¶ 97.) These allegations adequately state a claim for breach of fiduciary duty based on DLP Partner's self-interested misuse of managerial authority.

37. DLP Partner maintains that the derivative claim for breach of fiduciary duty must be dismissed. This is so, DLP Partner contends, because directing BDO not to issue the appraisal does not implicate any duty owed to Wilson Holding, even if it might implicate a duty owed to Healthcare Foundation. But DLP Partner cites no law for that proposition. The duty of loyalty requires the manager to put the interest of the company and members ahead of its own self-interest. *See, e.g., Cede & Co. v.*

*Technicolor*, 634 A.2d 345, 361 (Del. 1993) ("Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interests possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."). The allegation that DLP Partner acted to benefit itself is sufficient to state a claim for breach of the duty of loyalty.

38. Even if the claim for breach of fiduciary duty against DLP Partner survives, DLP Healthcare argues that it cannot be liable for aiding and abetting because the amended complaint does not allege knowing participation or damages. The Court disagrees.

39. Although Delaware courts have observed that it is difficult to prove knowing participation, they have also acknowledged that it is not quite as difficult to plead that element. The complaint must allege "facts making it reasonably conceivable that the defendant knowingly supported a breach of duty *and* that his resulting assistance to the primary actor constituted substantial assistance in causing the breach." *In re Oracle Corp. Derivative Litig.*, 2020 Del. Ch. LEXIS 218, at *33 (Del. Ch. June 22, 2020) (emphasis in original). Here, the amended complaint alleges that DLP Healthcare used its influence as a close affiliate to instigate DLP Partner's decision to stop BDO from issuing the final appraisal. (*See* V. Am. Compl. ¶¶ 96, 98, 128.) A reasonable inference that arises from the allegations is that DLP Partner would not have interfered with BDO's performance if DLP Healthcare had not urged it to do so. (*See* V. Am. Compl. ¶ 96.) These allegations are not extensive, and Healthcare Foundation may face challenges in proving its case. But "[a]t this preliminary stage

of the litigation," the Court "cannot rule out the possibility" that DLP Healthcare knowingly participated in DLP Partner's breach of its fiduciary duties. *Stewart v. Wilmington Tr. SP Servs.*, 112 A.3d 271, 321 (Del. Ch. Mar. 26, 2015).[2]

40. As for damages, DLP Healthcare contends that Healthcare Foundation may yet receive the purchase price that it seeks and therefore has not been injured. But Healthcare Foundation alleges that BDO would have issued its final appraisal long ago absent DLP Partner's interference, that the closing would also have occurred, and that the ongoing delay has kept Healthcare Foundation from receiving $55 million in proceeds and enjoying the benefits of the put option that it bargained for. That is more than enough to allege injury.

41. Accordingly, the Court denies the motion to dismiss the claims for breach of fiduciary duty and aiding and abetting the breach.

## C. Tortious Interference

42. The final claim is a derivative claim for tortious interference with contract. This claim is also based on the allegation that DLP Partner improperly directed BDO not to issue the final appraisal in July 2025, thus tortiously interfering with the appraisal agreement between BDO and Wilson Holding.

43. Once more, the Court applies Delaware law, as urged by the parties. *See Bluebird*, 188 N.C. App. at 680–81 (discussing "internal affairs doctrine").

---

[2] In connection with this issue, DLP Partner points out that DLP Healthcare is its subsidiary and that a subsidiary, by definition, cannot *direct* its parent's actions. Perhaps so. But the element of knowing participation requires substantial *assistance*, not puppeteer-like direction.

44. A claim for tortious interference with contract arises when a person induces a third party to breach an existing contract with the plaintiff. Under Delaware law, "[t]here must be (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265–66 (Del. 2004) (citation and quotation marks omitted). In other words, Healthcare Foundation must allege that DLP Partner induced BDO to breach the appraisal agreement, causing harm to Wilson Holding.

45. The amended complaint states that DLP Partner caused "BDO to refrain from issuing the" final appraisal and thereby "caused BDO to breach the Appraisal Agreement." (V. Am. Compl. ¶ 143.) At no point, though, does the amended complaint allege facts sufficient to show that BDO's delay is a breach of the appraisal agreement, particularly given the express allegation that BDO withheld its final appraisal at the request of an agent (DLP Partner) of the other contractual party (Wilson Holding). (*See, e.g.*, V. Am. Compl. ¶¶ 91, 100.) Moreover, although Healthcare Foundation may have suffered harm from the delay, it is difficult to see what harm Wilson Holding has suffered. The only allegation of harm is conclusory and therefore insufficient to support the claim. (*See* V. Am. Compl. ¶ 145.)

46. Accordingly, the Court grants the motion to dismiss this claim. Because Healthcare Foundation has already amended its complaint, the Court dismisses this claim with prejudice. *See First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013)

("The decision to dismiss an action with or without prejudice is in the discretion of the trial court . . . .").

## IV.
## CONCLUSION

47.   For all these reasons, the Court **GRANTS** the motion to dismiss the derivative claim against DLP Partner for tortious interference with contract.  This claim is dismissed with prejudice.  The Court **DENIES** the motion to dismiss in all other respects.


    **SO ORDERED**, this the 23rd day of June, 2026.


                              /s/ Adam M. Conrad
                              Adam M. Conrad
                              Special Superior Court Judge
                               for Complex Business Cases