# IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

<table>
<tr>
<td>

FAIZ KHAN and RALPH FINGER, on behalf of themselves and all others similarly situated,

        Plaintiffs,

v.

WARBURG PINCUS, LLC, WARBURG PINCUS PRIVATE EQUITY XII, L.P., WARBURG PINCUS PRIVATE EQUITY XII-B, L.P., WARBURG PINCUS PRIVATE EQUITY XII-D, L.P., WARBURG PINCUS PRIVATE EQUITY XII-E, L.P., WP XII PARTNERS L.P., WARBURG PINCUS XII PARTNERS, L.P., WP CITYMD TOPCO LLC, WALGREENS BOOTS ALLIANCE, INC., and VILLAGE PRACTICE MANAGEMENT COMPANY LLC,

        Defendants.

</td>
<td>

C.A. No. 2024-0523-LWW

</td>
</tr>
</table>

## MEMORANDUM OPINION

Date Submitted: January 23, 2025
Date Decided: April 30, 2025

Ned Weinberger & Michael C. Wagner, LABATON KELLER SUCHAROW LLP, Wilmington, Delaware; John Vielandi & Jiahui (Rose) Wang, LABATON KELLER SUCHAROW LLP, New York, New York; *Counsel for Plaintiffs Faiz Khan and Ralph Finger*

William M. Lafferty, Ryan D. Stottmann & Rachel R. Tunney, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, Delaware; Tariq Mundiya, Sameer Advani, Vanessa C. Richardson & Richard Li, WILLKIE FARR & GALLAGHER LLP, New York, New York; *Counsel for Defendants Warburg Pincus, LLC,*

*Warburg Pincus Private Equity XII, L.P., Warburg Pincus Private Equity XII-B, L.P., Warburg  Pincus Private Equity XII-D, L.P., Warburg Pincus Private Equity XII-E, L.P., WP XII Partners L.P. and Warburg Pincus XII Partners, L.P.*

C. Barr Flinn, Paul J. Loughman & Skyler A. C. Speed, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Eric Leon & Nathan Taylor, LATHAM & WATKINS LLP, New York, New York; *Counsel for Defendants Village Practice Management Company LLC and WP CityMD Topco LLC*

Kevin R. Shannon, Christopher N. Kelly & Callan R. Jackson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Kristen R. Seeger, John M. Skakun III & Takayuki Ono, SIDLEY AUSTIN LLP, Chicago, Illinois; *Counsel for Defendant Walgreens Boots Alliance, Inc.*

**Will, Vice Chancellor**

This case concerns the merger of an urgent care provider and a primary care provider. The urgent care provider—a limited liability company—was majority owned by a private equity firm. The remaining owners were physician-members. These groups held separate classes of units with different rights.

The urgent care provider's limited liability company agreement gave minority members a tag-along right to participate in transactions on the same terms as private equity-affiliated members. The agreement permitted amendments to such rights if a vote of the affected member class was secured. It also waived fiduciary duties owed by the private equity affiliates and allowed them to act in their own interests.

The private equity affiliates negotiated disparate consideration for themselves in the merger. Thus, an amendment to the limited liability company agreement was required to eliminate the minority's tag-along right. The requisite class vote was obtained after members received a detailed information statement.

A year after closing, the minority members' consideration lost value. They sued in this court, claiming that they were treated unfairly and coerced into voting for the amendment. They chiefly assert that the implied covenant of good faith and fair dealing in the limited liability company agreement was breached. Their arguments, however, improperly inject common law fiduciary duties into a contractual relationship that eliminated them.

1

Because the limited liability agreement leaves no room for a quasi-fiduciary theory disguised as an implied covenant claim, this case is dismissed.

## I.    FACTUAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the Verified Class Action Complaint (the "Complaint") and the documents it incorporates by reference.[1]

### A.    The Summit Merger

CityMD is an urgent care provider with locations across New York and New Jersey.[2]  It was cofounded in 2010 by partners including Dr. Faiz Kahn—a plaintiff in this case.[3]

Initially, CityMD was owned by its physicians.[4]  In June 2017, private equity firm Warburg Pincus acquired a majority stake in CityMD through six funds it controls (the "WP Investors").[5]

---

[1] Verified Class Action Compl. (Dkt. 1) ("Compl.").  Exhibits to the Transmittal Affidavit of Rachel R. Tunney in Support of Opening Brief in Support of The WP Defendants' Motion to Dismiss Verified Class Action Complaint (Dkt. 11) are cited as "Defs.' Ex. __."

[2] Compl. ¶ 18.

[3] *Id.* ¶ 19.

[4] *Id.* ¶ 20.

[5] *Id.* ¶¶ 10, 21-22.  Warburg controls the private equity limited partnership funds it manages as general partner.  *Id.* ¶ 9.  The WP Investors are defendants Warburg Pincus Private Equity XII, L.P., Warburg Pincus Private Equity XII-B, L.P., Warburg Pincus Private Equity XII-D, L.P., Warburg Pincus Private Equity XII-E, L.P., WP XII Partners L.P., and

Two years later, in June 2019, CityMD announced plans to merge with Summit Medical Group—a physician-led multi-specialty group.[6] The merger closed in August 2019, resulting in a combined entity called WP CityMD Topco LLC (the "Company"), a Delaware limited liability company.[7]

CityMD's and Summit's investors rolled over their equity into the new Company. The WP Investors gained 60% ownership of the Company through Class A units.[8] CityMD's non-Warburg investors held a 17% ownership position through Class B units.[9]

## B. The LLC Agreement

After closing, the unitholders' relationships were governed by the Amended and Restated Limited Liability Company Operating Agreement of WP CityMD Topco LLC (the "LLC Agreement").[10]

The LLC Agreement included several minority protections.[11] In an "Extraordinary Transaction," each class of unitholders would receive the same form

---

Warburg Pincus XII Partners, L.P. *Id.* ¶ 10. Each fund is a Delaware limited partnership formed by Warburg affiliates as an investment vehicle. *Id.*

[6] *Id.* ¶ 23.

[7] *Id.* ¶¶ 23-25.

[8] *Id.* ¶¶ 27-28.

[9] *Id.* ¶ 26.

[10] *Id.* ¶ 35; *see* Defs.' Ex. A ("LLC Agreement").

[11] Compl. ¶ 36.

and amount of consideration based on their "[p]ro [r]ata [p]ortion."[12]  The proceeds would be distributed according to a waterfall in the LLC Agreement, with Class A units given the most senior position.[13]  The LLC Agreement further provided minority unitholders with tag-along rights that allowed them to participate on equal terms in certain sales of Company units by the WP Investors.[14]  To amend these provisions, the LLC Agreement required consent from a majority of any class of unitholders whose rights would be adversely affected by the amendment.[15]

The LLC Agreement also included broad waivers of the WP Investors' fiduciary duties in four provisions.[16]  It stated that the WP Investors and their affiliates owed no fiduciary or other duties to the Company or its members beyond the duty to comply with the LLC Agreement.[17]  It further provided that each WP investor was permitted to "act exclusively in . . . its own interest and without regard

---

[12] LLC Agreement § 4.01(a); *see* Compl. ¶ 37; *see also* LLC Agreement § 1.01 (defining "Pro Rata Portion").  An "Extraordinary Transaction" includes "a transaction in which the current equity holders cease to hold more than 50% of the Company or the right to appoint a majority of the Board, a sale of substantially all of the assets of the Company or the liquidation of the Company."  Compl. ¶ 37; *see* LLC Agreement § 1.01.

[13] LLC Agreement § 4.01(b).

[14] Compl. ¶ 38; *see* LLC Agreement §§ 7.03(a)-(b).

[15] Compl. ¶¶ 44, 88; *see* LLC Agreement § 14.04.

[16] LLC Agreement §§ 5.03(b), 10.01(b), 14.01(b)(i)-(ii).

[17] *Id.* §§ 5.03(b), 10.01(b), 14.01(b)(i), 14.04(b)(ii).

4

to the interest of any other person," so long as it complied with the LLC Agreement.[18]

## C.    The VillageMD Merger

In late 2021, Warburg begin exploring a sale of the Company.[19]  The Company signed a non-disclosure agreement with Village Practice Management Company LLC ("VillageMD"), a national primary care provider majority owned by Walgreens Boots Alliance, Inc.[20]  Warburg had preliminary discussions with VillageMD in early 2022, but negotiations stalled.[21]  They resumed in July 2022 after an exclusivity period with another potential buyer ended.[22]

In August, VillageMD sent the Company a non-binding letter of intent.[23]  The letter of intent proposed that the Company's investors receive different consideration by class.  Class A unitholders (the WP Investors) would receive all cash.[24]  The other classes (including Class B unitholders)—referred to as the "Partial Rollover Holders"—would receive a mix of cash and VillageMD equity.[25]

---

[18] *Id.* § 5.03(b).

[19] Compl. ¶ 45.

[20] *Id.* ¶¶ 46-47

[21] *Id.* ¶ 47.

[22] *Id.*

[23] *Id.* ¶ 49.

[24] *Id.*

[25] *Id.*

After negotiations led by Warburg representatives, a final letter of intent was signed in September and approved by the Company's Board of Managers.[26] It contemplated mixed consideration of $4.5 billion in cash and $2.5 million in VillageMD equity, with Class A unitholders receiving all cash.[27]

### D. The Merger Agreement

About three weeks later, the Company's outside legal counsel sent an initial draft merger agreement to VillageMD.[28] Alston & Bird LLP was selected to act as outside counsel to the Partial Rollover Holders around this time.[29]

The parties negotiated a merger agreement over the ensuing weeks. The merger consideration for Company investors was increased to $7 billion, with $4.95 billion in cash and $2.05 billion in VillageMD equity.[30] Class A unitholders would receive $3.3 billion in cash.[31] The Partial Rollover Holders, who were required to roll at least 40% of their Company units into VillageMD equity, would receive $1.6 billion in cash.[32]

---

[26] *Id.* ¶ 51.

[27] *Id.*

[28] *Id.* ¶ 52.

[29] *Id.* ¶ 63; *see* Defs.' Ex. D ("Information Statement") 11.

[30] Compl. ¶ 54.

[31] *Id.*; *see* Information Statement 11.

[32] Compl. ¶¶ 56-58.

The parties signed the final Merger Agreement on November 7, 2022.[33]

### E.    The LLC Agreement Amendment

Because the Merger Agreement contemplated disparate consideration for different unitholder classes, an amendment to the LLC Agreement was required (the "Amendment").[34]   The merger with VillageMD was conditioned on the Partial Rollover Holders approving the Amendment.[35]   The Amendment involved several changes to the LLC Agreement, including that: (1) the distribution waterfall would be modified to permit the allocation of merger consideration as provided in the Merger Agreement;[36] and (2) the minority unitholders' tag-along right would not apply to the transfer of units through the merger with VillageMD.[37]

The Merger Agreement also required Partial Rollover Holders to sign and return a letter of transmittal to receive their merger consideration.[38]   The letter of transmittal included a broad release of claims concerning the Merger Agreement and Amendment.[39]

---

[33] *Id.* ¶ 52; *see* Defs.' Ex. C ("Merger Agreement").

[34] Compl. ¶ 62.

[35] *Id.*; *see* LLC Agreement § 14.04.

[36] Defs.' Ex. B ("Amendment") § 1(b); *see* LLC Agreement § 4.01.

[37] Amendment § 1(d); *see* LLC Agreement § 7.03.

[38] Compl. ¶ 68; *see* Merger Agreement § 2.17(a).

[39] Merger Agreement Ex. G § 4.

## F. The Information Statement

A week after the Merger Agreement was signed, the Partial Rollover Holders were sent a November 14 Information Statement.[40] The Information Statement attached the Merger Agreement and the form letter of transmittal.

The Partial Rollover Holders were told that they needed to submit a rollover election form, letter of transmittal, and consent to the Amendment within 20 days.[41] They could elect to roll over as little as 40% of their equity.[42] But if they did not timely return their form and consent, they would by default roll over 55%.[43]

The Information Statement stated that Class A unitholders and the Partial Rollover Holders would receive different merger consideration.[44] It added that the purpose of the Amendment to the LLC Agreement was to permit the classes' disparate consideration. A "Question and Answer" section beginning on the third page of the Information Statement included: "Why does the [LLC Agreement] need to be amended? What is the purpose of the [Amendment]?"[45] The three-paragraph answer explained that the Amendment waived the minority unitholders' "tag-along

---

[40] Compl. ¶ 67.

[41] *Id.*

[42] Information Statement 5.

[43] Compl. ¶ 67; *see* Information Statement 8.

[44] *Id.* at 5.

[45] *Id.* at 4.

right to . . . [receive] the same form of consideration as [Warburg]" and would "permit the allocation of the cash and equity consideration as provided in the Merger Agreement."[46]

The Information Statement said that the Partial Rollover Holders had their own counsel at Alston & Bird LLP. It told the Partial Rollover Holders that they could contact that counsel if they "ha[d] any questions about the [t]ransaction [d]ocuments or the [m]erger."[47]

The Company also held several information sessions to discuss the transaction with unitholders.[48] The sessions were attended by "numerous minority unitholders."[49] The information session did not address the implications of a waiver of tag-along rights.[50]

---

[46] *Id.*

[47] *Id.* at 9 (providing counsel's contact information); *see also id.* at 2, 7, 11.

[48] Compl. ¶ 69.

[49] *Id.*

[50] *Id.* ¶ 70.

### G. Closing

The requisite class votes were obtained in favor of the merger and the Amendment.[51] Both of the plaintiffs voted in favor. Both also signed and returned letters of transmittal, receiving millions of dollars in merger consideration.[52]

The merger closed on January 3, 2023.[53] The Company's Class A unitholders (the WP Investors) received $3.3 billion in cash consideration.[54] They also purchased $50 million in new (not rolled over) VillageMD equity.[55] The Partial Rollover Holders received at least $2 billion worth of VillageMD equity (since at least 40% of their Company units were rolled over) and about $1.6 billion of cash consideration.[56]

Walgreens controls the combined company.[57]

### H. This Litigation

About a year after the merger closed, in March 2024, Walgreens disclosed a $12.4 billion goodwill impairment charge on VillageMD.[58] It stated that the

---

[51] *See id.* ¶¶ 61, 71; *see also* Information Statement 2.

[52] *See* Defs.' Exs. E, F.

[53] Compl. ¶ 71.

[54] *Id.* ¶¶ 55, 57.

[55] *Id.* ¶ 55; Information Statement 5.

[56] Compl. ¶¶ 56-57.

[57] *Id.* ¶ 60.

[58] *Id.* ¶ 73.

10

impairment charge was "due to downward revisions in [the combined company's] longer term forecast received during" the first quarter of 2024.[59]

The plaintiffs filed this lawsuit several weeks later, on April 16.[60] The plaintiffs are CityMD cofounder Kahn and Dr. Ralph Finger—both former Company Class B unitholders.[61] They purport to bring suit on behalf of all similarly situated former Company unitholders.

The plaintiffs seek money damages and declaratory relief for alleged harms caused by the merger.[62] They advance four counts. Count I is a claim for breach of the implied covenant of good faith and fair dealing against the WP Investors and the Company.[63] Count II is a claim for tortious interference with contractual relations against Warburg.[64] Count III is a claim for tortious interference with contractual relations against Walgreens and VillageMD.[65] And Count IV is a claim for unjust enrichment against Warburg and the WP Investors.[66]

---

[59] *See* Walgreens Boots Alliance, Inc., Quarterly Report on Form 10-Q (filed Mar. 28, 2024) 15.

[60] *See* Dkt. 1.

[61] Compl. ¶¶ 7-8.

[62] *Id.* at 36.

[63] *Id.* ¶¶ 82-93. Although Count I is also nominally styled a breach of contract claim, the plaintiffs are only advancing an implied covenant theory. *See infra* note 72.

[64] Compl. ¶¶ 94-101.

[65] *Id.* ¶¶ 102-06.

[66] *Id.* ¶¶ 107-13.

11

In July 2024, Warburg and the WP Investors, Walgreens, and VillageMD filed separate motions to dismiss the claims against them.[67] The plaintiffs filed an omnibus answering brief on September 17.[68] The defendants filed reply briefs in support of dismissal a month later.[69] The motions were taken under advisement after oral argument on January 23, 2025.[70]

## II. LEGAL ANALYSIS

The defendants seek dismissal under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Their motions are governed by the reasonable conceivability standard:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any

---

[67] *See* Dkts. 10, 12, 13 (Mots. to Dismiss); Dkt. 12 (Walgreens Boots Alliance, Inc.'s Opening Br. in Supp. of its Mot. to Dismiss); Dkt. 14 (Village Practice Management Company LLC's and WP CityMD Topco LLC's Opening Br. in Supp. of their Mot. to Dismiss the Verified Class Action Compl.) ("VillageMD Opening Br."); Dkt. 15 (Opening Br. of the WP Investors and Warburg Pincus, LLC in Supp. of Their Motion to Dismiss the Verified Class Action Compl.) ("WP Defs.' Opening Br.").

[68] Dkt. 38 (Pls.' Omnibus Answering Br. in Opp'n to Defs.' Mots. to Dismiss) ("Pls.' Answering Br.").

[69] Dkt. 41 (Village Practice Management Company LLC's and WP CityMD Topco LLC's Reply Br. in Supp. of Their Mot. to Dismiss the Verified Class Action Compl.); Dkt. 42 (Reply Br. of the WP Investors and Warburg Pincus, LLC in Supp. of Their Mot. to Dismiss the Verified Class Action Compl.); Dkt. 43 (Walgreens Boots Alliance, Inc.'s Reply Br. in Supp. of Its Mot. to Dismiss).

[70] Dkt. 54; *see* Dkt. 55.

reasonably conceivable set of circumstances susceptible of proof."[71]

The Complaint falls short of this standard. The plaintiffs have not pleaded a reasonably conceivable breach of contract or breach of the implied covenant of good faith and fair dealing by the Company or WP Investors. Without an underlying breach, the tortious interference and unjust enrichment claims necessarily fail.

## A. Breach of the Implied Covenant of Good Faith and Fair Dealing

Although the plaintiffs assert that unitholder approval of the merger and Amendment "did not comply with the LLC Agreement," they cite no express provision that was breached.[72] Instead, they claim that the WP Investors and Company breached the implied covenant of good faith and fair dealing by negotiating away their tag-along right before "coercing" allegedly uninformed Partial Rollover Holders to consent to an amendment eliminating it.[73]

---

[71] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citation omitted).

[72] Pls.' Answering Br. 2. The Complaint nominally includes a claim for breach of the LLC Agreement's express terms in Count I. *See* Compl. ¶¶ 90, 93 (asserting that the Company and WP Investors violated Sections 4.01, 7.03, 7.04, and 14.04 of the unamended LLC Agreement). There are no allegations that the amended LLC Agreement was violated. In any event, the plaintiffs' briefing is silent on any express breach of contract claim. It is waived to the extent any such claim was advanced in the first place. *See Emerald P'rs v. Berlin*, 726 A.2d 1215 (Del. 1999) ("Issues not briefed are deemed waived.").

[73] *See* Pls.' Answering Br. 32-40; *see id.* at 25 (arguing that their "claims generally arise from breaches of the implied covenant of good faith and fair dealing in the LLC Agreement"); *see also* Compl. ¶¶ 87, 89.

13

To succeed on this claim, the plaintiffs must show "a specific implied contractual obligation, a breach of that obligation by [the Company and the WP Investors], and resulting damage to [the plaintiffs]."[74] The claim fails on the first element.

The implied covenant of good faith and fair dealing "is a limited and extraordinary legal remedy."[75] It is "'best understood as a way of implying terms in [an] agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions."[76] It "does not apply when the contract addresses the conduct at issue, but only when the contract is truly silent concerning the matter at hand."[77]

The logical first step in assessing an implied covenant claim is to determine whether the contract has a gap.[78] Of course, if the contract explicitly addresses the matter at hand, there is no gap for the implied covenant to fill. "[T]he implied

---

[74] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (citing *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

[75] *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010)).

[76] *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996)).

[77] *Oxbow*, 202 A.3d at 507 (citation omitted); *see also Dunlap*, 878 A.2d at 441 ("[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement." (citation omitted)).

[78] *Miller v. HCP & Co.*, 2018 WL 656378, *9 (Del. Ch. Feb. 1, 2018), *aff'd sub nom. Miller v. HCP Trumpet Invs., LLC*, 194 A.3d 908 (Del. 2018).

covenant cannot be used to circumvent the parties' bargain" when "[e]xisting contract terms control."[79]

Here, the LLC Agreement explicitly addressed the matters at issue. It set out requirements to amend its terms—including the tag-along right—leaving no gap for the implied covenant to fill. The plaintiffs' coercion theory does not save their claim because the LLC Agreement waived fiduciary duties and permitted the WP Investors to act in their own interests. Finally, the plaintiffs' disclosure-related argument is also foreclosed by the LLC Agreement's terms.

### 1. No Implied Term on Eliminating the Tag-Along Right

The plaintiffs first assert that there is an "implicit term" in the LLC Agreement prohibiting the WP Investors from taking action with "the effect of destroying, injuring, or frustrating the Class B [unitholder's] right to receive the fruits of the tag-along right."[80] Before the Amendment, the tag-along right in Section 7.03(a) of the LLC Agreement contemplated that if Warburg sold or transferred Class A units at a favorable price, other unitholders could participate in the deal on the same terms.[81] In the plaintiffs' view, the Class B unitholders expected when signing the LLC

---

[79] *Dunlap*, 878 A.2d at 441.

[80] Pls.' Answering Br. 30-31.

[81] LLC Agreement § 7.03(b) ("Each Prospective Tagging Member shall have the right . . . to request that the Transferring Member include in the proposed Transfer a number of Class A Units, vested Class B Units and vested Class I Units held by such Prospective Tagging Member . . . ."); *see also* Compl. ¶¶ 38-42.

Agreement that the Company's Class A-affiliated managers would not "negotiate-away" the tag-along right.[82] They contend that this implied term was "so obvious" that the parties "never would have thought to negotiate terms explicitly prohibiting [it]."[83]

The problem for the plaintiffs is that the LLC Agreement contemplates amendments adversely affecting the rights of a particular class of units and outlines the steps required for approval of such amendments.[84] Section 14.04(c) permits amendments that "disproportionately affect in a material and adverse manner" a class of unitholders relative to another class so long as the amendment receives the "prior written consent" of a majority of the affected class.[85] The plaintiffs acknowledge that a class vote was obtained in favor of the Amendment, which eliminated the tag-along right.[86] "The implied covenant will not infer language that contradicts a clear exercise of an express contractual right."[87]

---

[82] Pls.' Answering Br. 31.

[83] *Id.*

[84] LLC Agreement § 14.04; *see* Compl. ¶¶ 44, 88.

[85] LLC Agreement § 14.04(c) (stating that amendments disproportionately affecting the rights of a class "shall require the consent of Members holding a majority of Membership Units of the class or classes of Membership Units so adversely affected"); *see* Compl. ¶ 44.

[86] *See* Pls.' Answering Br. 2; Compl. ¶¶ 88-90; *see also* Amendment § 1(d)(v).

[87] *Nemec*, 991 A.2d at 1127.

16

If the parties wanted to include additional protections against amending the tag-along provision—or to bar changes to it—they could have done so. They did not. The implied covenant cannot be wielded to rewrite the LLC Agreement or grant the plaintiffs rights they never bargained for.[88]

### 2. No Implied Term Barring Differential Consideration

The plaintiffs also argue that the LLC Agreement contained an implied term that the WP Investors and Company would not eliminate Class B unitholders' tag-along right through a "coerced" Amendment to permit differential consideration.[89] According to the plaintiffs, this implicit term prevented the WP Investors and Company from "conditioning the benefits of the Merger on the Class B [unitholders'] waiver of [their] tag-along right" through the Amendment.[90] The Amendment purportedly caused a "wrongful transfer" of merger consideration from the Partial Rollover Holders to the Class A unitholders, which violated the plaintiffs' "reasonable expectations when they signed the LLC Agreement."[91]

---

[88] *See Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004) (declining to find a breach of implied covenant where "do[ing] so would be to grant the plaintiffs, by judicial fiat, contractual protections that they failed to secure for themselves at the bargaining table"), *aff'd*, 861 A.2d 1251 (Del. 2004).

[89] *See* Pls.' Answering Br. 33-38.

[90] *Id.* at 35; *see* Compl. ¶¶ 4, 61.

[91] Pls.' Answering Br. 36 (quoting *In re Delphi Fin. Grp. S'holder Litig.*, 2012 WL 729232, at *16 (Del. Ch. Mar. 6, 2012)).

In multiple provisions, however, the LLC Agreement eliminated any fiduciary duties owed by the WP Investors or persons affiliated with them.[92] The WP Investors were not "obligated to do or perform any act or thing in connection with the Company and its subsidiaries not expressly set forth in th[e] [LLC] Agreement."[93] The LLC Agreement expressly allowed the WP Investors to "act exclusively in [their] own interest[s] and without regard to the interest of any other Person."[94] If there was a "conflict of interest between the Company or its Subsidiaries, on the one hand, and any Member, Manager or officer [who was a 'WP

---

[92] *See* LLC Agreement § 5.03(b) ("[T]o the fullest extent permitted by law, no Member, Manager or officer of the Company (to the extent such officer is a WP Person) [] shall have any fiduciary or other duty to the Company or its Subsidiaries or the Members…provided, however, that this Section 5.03(b) shall not limit any Person's obligation to comply with the express terms of this Agreement . . . ."); *id.* § 10.01(b) ("To the fullest extent permitted by law [] no Member, Manager or officer of the Company (to the extent such officer is a WP Person) [] shall (i) have any fiduciary or other duties to the Company or any Member other than the duty to comply with the applicable terms and provisions . . . ."); *id.* § 14.01(b)(i) ("[T]o the fullest extent permitted by applicable law: (i) confirms that, notwithstanding anything herein to the contrary, each Member, Manager or officer of the Company (to the extent such officer is a WP Person) [] has no fiduciary or other duty (contractual or otherwise) to the Company or any of its Subsidiaries except as may be expressly set forth in this Agreement . . . ."); *id.* § 14.01(b)(ii) ("[T]o the fullest extent permitted by applicable law [] each Member, Manager or officer of the Company (to the extent such officer is a WP Person) [] has no fiduciary or other duty (contractual or otherwise) to any Member (other than, in the case of a Member, Manager or officer of the Company that is a WP Person, to the WP Investors) except as may be expressly set forth in this Agreement . . . .").

[93] *Id.* § 10.01(b)(ii).

[94] *Id.* § 5.03(b).

18

Person'], on the other hand, such [WP Person] [could] act solely in their own best interest."[95]

As a result, the LLC Agreement has no gap preventing the WP Investors from negotiating for disparate consideration—or undertaking an Amendment to permit it. By its very terms, the LLC Agreement allowed the WP Investors to put their interests ahead of Class B unitholders, so long as the WP Investors complied with the LLC Agreement's terms. The LLC Agreement, as addressed above, permitted amendments that adversely affected one class. There is no reasonably conceivable basis to conclude the WP Investors or Company's actions "frustrat[ed] the fruits of the bargain that the [plaintiffs] reasonably expected."[96] The contractual arrangement the parties reached suggests that the plaintiffs would have expected otherwise.

Still, the plaintiffs insist that wrongful conduct "in the corporate context" constitutes a "violation of the LLC Agreement and the implied proscription against coerced unitholder approvals."[97] They rely on *In re Delphi Financial Group Shareholder Litigation*, where a controlling stockholder allegedly breached his fiduciary duties by coercing the minority into approving a charter amendment that

---

[95] *Id.* § 14.01(b)(iii). "WP Person" is defined as "any WP Investor, any Affiliate of any WP Investor, any WP Manager or any Person appointed by, or acting at the direction of, any of the foregoing as an officer, manager or director of any Company Entity." *Id.* § 1.01.

[96] *Nemec*, 991 A.2d at 1126.

[97] Pls.' Answering Br. 34.

allowed him to receive disparate consideration in a merger.[98]  Yet that case is in the

*corporate* context.[99]  All but one of the other "coercion" cases cited by the plaintiffs

in support of their claim likewise concern corporate fiduciaries.[100]  The only case

cited in the LLC context is inapposite.[101]

Unfairness in a fiduciary duty analysis—as in *Delphi*—is distinct from the

implied covenant theory brought here.  In analyzing an implied covenant claim, the

court is not resolving whether a "fiduciary acted fairly when engaging in the

challenged transaction as measured by duties of loyalty and care whose contours are

mapped out by Delaware precedents."[102]  The court is instead assessing "fairness"

---

[98] *Id.*

[99] Further, the court in *Delphi* did not address whether the controlling stockholder's conduct violated the implied covenant of good faith and fair dealing.  *See* 2012 WL 729232, at *17.

[100] *See* Pls.' Answering Br. 37-38 nn.103-105 (citing corporate cases about coercion); *cf. In re Dell Techs. Inc. Class V S'holder Litig.*, 2020 WL 3096748, at *20-21 (Del. Ch. June 11, 2020) (warning that "[r]eflexively applying language from a decision issued in one context to a factual scenario implicating a different context, just because the decision uses the term 'coercion,' can lead to erroneous results").

[101] The plaintiffs cite *Bakerman v. Sidney Frank Importing Co*., where the court allowed an implied covenant claim to survive alongside claims for breach of fiduciary duty and breach of contract.  2006 WL 3927242, at *6 (Del. Ch. Oct. 10, 2006).  But *Bakerman* involved allegations that the plaintiff's consent to a transaction was obtained under duress—specifically, "a threat to file a lawsuit against [the plaintiff] and a threat to terminate his employment." *Id.* at *16.  The plaintiffs here do not allege any such duress.

[102] *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418-19 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc*., 76 A.3d 808 (Del. 2013).

and "good faith" in view of the terms and purpose of a contract.[103]  Fiduciary duty claims are not a replacement for implied covenant claims, particularly where fiduciary duties are disclaimed in an LLC agreement.

Delaware law upholds the elimination of fiduciary duties in LLC agreements.[104]   Our courts are "all the more hesitant to resort to the implied covenant" where, as here, an alternative entity agreement "eliminates fiduciary duties as part of a detailed contractual governance scheme."[105]   "Respecting the elimination of fiduciary duties requires that courts not bend an alternative and less powerful tool"—the implied covenant—"into a fiduciary substitute."[106]

The plaintiffs next argue that the LLC Agreement is "subject to general equitable principles" and "provides that Company officers owe members and the Company fiduciary duties coextensive with what corporate officers generally owe under Delaware law."[107]  The LLC Agreement states that Company officers "other

---

[103] *Id.* at 419; *see also Miller*, 2018 WL 656378, at *9 ("'[F]air dealing' here does not imply equitable behavior.  The term 'fair' is something of a misnomer here; it simply means actions consonant 'with the terms of the parties' agreement and its purpose.'" (citing *Gerber*, 67 A.3d at 419)).

[104] *See, e.g.*, *AM Gen. Hldgs. LLC v. The Renco Grp., Inc.*, 2016 WL 4440476, at *15 (Del. Ch. Aug. 22, 2016) (noting that "the LLC Act enables contracting parties to alter and even eliminate equitable fiduciary duties in the LLC context"); *see also* 6 *Del. C.* § 18-1101(c).

[105] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010).

[106] *Id.* at 1018-19.

[107] Pls.' Answering Br. 34.

21

than an officer that is a WP Person" owe fiduciary duties to the Company and its members comparable to duties owed in the corporate context.[108] But the plaintiffs are not pursuing claims against non-Warburg Company officers.[109] The narrow provision addressing non-Warburg officers' fiduciary duties in no way overrides the broad waiver of fiduciary duties for Warburg and its affiliates.

### 3. No Implied Term on Disclosures

The plaintiffs' final implied covenant argument is that the "LLC Agreement, under the implied covenant, required full material disclosure before a unitholder vote."[110] They allege that minority unitholders' votes were solicited without the benefit of all material information—in particular, about the elimination of the tag-along right and Class A unitholders' conflicts of interest in negotiating differential merger consideration.[111] At the same time, they say that the Information Statement was too long to review in the 20 days allotted.[112]

---

[108] LLC Agreement § 6.01.

[109] The plaintiffs' answering brief argues that the Company's "CEO's and President's conduct" is "imputed to the Company" for purposes of their claim. Pls.' Answering Br. 42. The Complaint makes no mention of actions taken by the CEO or President.

[110] *Id.* at 40.

[111] *Id.* at 39-40.

[112] *Id.* at 22; *see also id.* at 39-40 (arguing that the Partial Rollover Holders did not receive adequate notice of the meeting).

As an initial matter, this argument is unsupported by the Complaint.[113]  Even if it is fairly presented, it fails on the merits.  Once again, the LLC Agreement forecloses it.

No free-floating duty of disclosure was owed because, as discussed, the LLC Agreement eliminated fiduciary duties.[114]  Further, as the plaintiffs acknowledge, the LLC Agreement addresses notice to unitholders.[115]  Section 3.11(b) of the LLC Agreement requires "[r]easonable and sufficient notice of each [member] meeting" to Class A and Class B unitholders.[116]  If the parties wanted the provision to address substantive disclosure requirements in the context of a vote by written consent, the LLC Agreement could have said so.[117]

\*                \*                \*

The plaintiffs paint the unitholder vote on the merger and Amendment as a Hobbesian choice.  The Partial Rollover Holders could accept the Amendment and receive merger consideration.  Or they could reject the Amendment and lose the

---

[113] *See Cal. Pub. Emps. Ret. Sys. v. Coulter*, 2002 WL 31888343, at *12 (Del. Ch. Dec. 18, 2002) ("Arguments in briefs do not serve to amend the pleadings.").

[114] *See supra* notes 16-18, 92-95 and accompanying text.

[115] Pls.' Answering Br. 17; *see also id.* at 40.

[116] LLC Agreement § 3.11(b).

[117] *See Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008) (explaining that the implied covenant "cannot be invoked where the contract itself expressly covers the subject at issue"), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE).

merger.[118]  They chose the former outcome after receiving a detailed Information Statement and the opportunity to confer with counsel representing them.

The Partial Rollover Holders now wish for a different deal.  But the implied covenant is not a means to obtain it.  The LLC Agreement waived the Warburg affiliates' fiduciary duties and permitted them to act solely in their own interests.  It also outlined the process for amendments that adversely affected one unitholder class, which was followed.

The Company was not a corporation; the plaintiffs are not stockholders.  The matters at hand are contractual ones.  Delaware law does not provide for quasi-fiduciary damages for a breach of the implied covenant where the contract belies the plaintiff's position.  "The implied covenant, like the rest of our contracts jurisprudence, is meant to enforce the intent of the parties, and not to modify that expressed intent when remorse has set in."[119]

Count I is dismissed for failure to state a claim.

### B.    Tortious Interference with Contractual Relations

The plaintiffs advance claims for tortious interference with contractual relations against Warburg (Count II) and against Walgreens and VillageMD (Count III).  They allege that Warburg knew of the LLC Agreement and negotiated the

---

[118] Pls.' Answering Br. 37-38.

[119] *Miller*, 2018 WL 656378, at *1.

merger with Walgreens to eliminate the tag-along right, which benefitted Class A unitholders at the expense of Class B unitholders.[120] As to Walgreens and VillageMD, the Complaint states that they were also aware of the LLC Agreement and negotiated with Warburg to limit the cash consideration to Class B unitholders.[121]

A claim for tortious interference with business relations requires: "(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury."[122] An underlying contractual breach is a necessary factor.[123] The plaintiffs have not, however, sufficiently alleged a breach of any express or implied term the LLC Agreement. Their tortious interference claims are therefore dismissed.

---

[120] Compl. ¶¶ 94-101.

[121] *Id.* ¶¶ 102-06.

[122] *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1266-67 (Del. 2004) (citation omitted).

[123] *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006) (explaining that "[t]o state a tortious interference claim, a plaintiff must properly allege an underlying breach of contract" and dismissing the claim where no such breach was pleaded); *Cousins v. Goodier*, 283 A.3d 1140, 1160 (Del. 2022) ("[T]o prevail on a tortious interference claim, a plaintiff must show that the defendant knew of a contract involving the plaintiff, intentionally and improperly interfered with it, and was a significant factor in causing the contract to be breached or otherwise terminated.").

## C.    Unjust Enrichment

Finally, the plaintiffs bring a claim for unjust enrichment against Warburg and the WP Investors. They assert that the Warburg and the WP Investors were unjustly enriched by a scheme to eliminate Class B unitholders' right to receive the same merger consideration as Class A unitholders.[124] The elements of this claim are: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment, [and] (4) the absence of justification . . . ."[125]

Unjust enrichment is a "remedy [in] the absence of a formal contract."[126] When analyzing an unjust enrichment claim, Delaware courts first consider whether "an express, enforceable contract" controls the parties' relationship.[127] The plaintiffs' claim arises from the LLC Agreement and concerns the elimination of the tag-along right through a class vote required by the LLC Agreement.[128] The LLC Agreement governs the matters at hand. An unjust enrichment claim is not a means

---

[124] Compl. ¶¶ 107-13.

[125] *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999); *see also Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 351 (Del. Ch. 2022).

[126] *Bakerman*, 2006 WL 3927242, at *18.

[127] *Id.*

[128] Compl. ¶¶ 108-10.

to "rewrite a comprehensive contract governing the entirety of the parties' relationship after finding disappointment in the resulting agreement."[129]

Accordingly, the claim cannot proceed against the WP Investors, which are parties to the LLC Agreement. Nor can it be used to extend the obligations of the LLC Agreement to Warburg, which is not a contractual party. "[U]njust enrichment cannot be used to circumvent basic contract principles [recognizing] that a person not a party to [a] contract cannot be held liable to it."[130]

The unjust enrichment claim (Count IV) is dismissed.

### D.  Release of Claims

The defendants argue that, even if the Complaint were viable, dismissal is required because the plaintiffs released their claims in the letters of transmittal they signed.[131] The plaintiffs respond that the releases in the letter of transmittal are unenforceable for lack of consideration.[132] In arguing for their respective positions, the parties' briefs explore *Cigna Health & Life Insurance Co. v. Audax Health*

---

[129] *Midcap Funding X Trust v. Graebel Cos., Inc.*, 2020 WL 2095899, at *18 (Del. Ch. Apr. 30, 2020) (quoting *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *8 (Del. Ch. Feb. 3, 2009)).

[130] *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59 (Del. Ch. 2012) (emphasis omitted).

[131] *See* WP Defs.' Opening Br. 30-31; VillageMD Opening Br. 30-31; *see also* Merger Agreement Ex. G § 4.A.

[132] *See* Pls.' Answering Br. 43-44.

*Solutions, Inc.*, where the Court of Chancery held that a similar release in a letter of transmittal was unenforceable because stockholders only received in exchange the merger consideration already owed to them by statute.[133]

This case presents notable distinctions from *Cigna*. For example, it involves an LLC—not a corporation—and does not implicate the statute highlighted in *Cigna*.[134] Unlike in *Cigna*, the Information Statement told unitholders that the releases were a condition to receiving merger consideration and the Merger Agreement attached a copy of the letter of transmittal.[135] At the same time, though, the Merger Agreement did not mention the releases in the body of the agreement itself and was signed before the Information Statement discussing the releases was distributed.[136]

There is scant case law on this issue in the corporate context—much less as applied to an LLC. The parties' briefs also devote few words to the subject.

---

[133] 107 A.3d 1082, 1085 (Del. Ch. 2014).

[134] *See id.* at 1089 (holding that the preexisting duty to merger consideration was derived from a statutory right specific to corporations).

[135] *See* Merger Agreement Ex. G; Information Statement 37, 56-57; *see also* WP Defs.' Opening Br. 30-31.

[136] In *Cigna*, the court rejected the defendants' argument that releases in a letter of transmittal formed part of the merger consideration where the releases were not mentioned in the merger agreement itself. 107 A.3d at 1091 (noting that the merger agreement "provided no indication to stockholders that they might have to agree to a release"). But *Cigna* does not address whether attaching the letter of transmittal containing releases to the merger agreement—as with the Merger Agreement here—would change the outcome.

28

Fortunately, I need not resolve it. I have concluded the Complaint fails to state a claim. Assuming (without deciding) that the claims were not released, the Complaint must be dismissed.

## III. CONCLUSION

The Complaint fails to state a claim on which relief can be granted. It is therefore dismissed with prejudice under Rule 12(b)(6).