Value Health Sols. Inc. v. Pharm. Rsch. Assocs., 2025 NCBC 34.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

VALUE HEALTH SOLUTIONS
INC. and NEIL RAJA,

          Plaintiffs,

v.

PHARMACEUTICAL
RESEARCH ASSOCIATES, INC.
and PRA HEALTH SCIENCES,
INC.,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18-CVS-12318

**ORDER AND OPINION ON
PLAINTIFFS' MOTION TO STRIKE
AND DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

**THIS MATTER** is before the Court on Plaintiffs Value Health Solutions Inc. ("VHS") and Neil Raja's (collectively, "Plaintiffs") Motion to Strike Defendants' Statute of Limitations Defense Under Rule 12(f) and/or Rule 12(c) ("Motion to Strike," ECF No. 214), and Defendants Pharmaceutical Research Associates, Inc. and PRA Health Sciences, Inc.'s (collectively, "PRA" or "Defendants") Motion for Summary Judgment and Partial Summary Judgment Pursuant to Rule 56(b) ("Motion for Summary Judgment," ECF No. 218, and together with the Motion to Strike, the "Motions").

**THE COURT**, having considered the Motions, the briefs and submissions of the parties, the arguments of counsel, and all appropriate matters of record, **CONCLUDES** that the Motion to Strike should be **DENIED** and the Motion for

Summary Judgment should be **GRANTED in part** and **DENIED in part**, for the reasons set forth below.

> *Guidry Law Firm PLLC, by David Glen Guidry, for Plaintiffs.*
>
> *Parker Poe Adams & Bernstein LLP, by John Moye and Jack K. Belk, for Defendants.*

Davis, Judge.

### FACTUAL AND PROCEDURAL BACKGROUND

1. As the Court has summarized on several prior occasions, this lawsuit involves a dispute between the parties in connection with PRA's acquisition of VHS (the "Acquisition") and its proprietary software ("PSO").[1] The Plaintiffs in this action are VHS and its founder, Raja. *Value Health Sols., Inc. v. Pharm. Rsch. Assocs.*, 2024 NCBC LEXIS 140, at *2 (N.C. Super. Ct. Nov. 6, 2024).

2. Plaintiffs filed their original Complaint on 5 October 2018. (ECF No. 5.) Since that time, this case has followed a lengthy and procedurally complicated path, which is more thoroughly summarized in prior opinions of this Court and the North Carolina Supreme Court. *See Value Health Sols., Inc. v. Pharm. Rsch. Assocs.*, 385 N.C. 250 (2023); *Value Health Sols.*, 2024 NCBC LEXIS 140, at *2–3; *Value Health Sols., Inc. v. Pharm. Rsch. Assocs.*, 2021 NCBC LEXIS 37, at *2–4 (N.C. Super. Ct. Apr. 5, 2021); *Value Health Sols., Inc. v. Pharm. Rsch. Assocs.*, 2020 NCBC LEXIS 65, at *1–14 (N.C. Super. Ct. May 22, 2020).

---

[1] Over the course of this litigation, both this Court and our Supreme Court have at various points referred to this proprietary software as the "Solutions." In this Opinion, however, the Court will instead refer to it as "PSO" as the parties do in their briefs.

3. On 22 May 2020 and 6 April 2021, the Court entered Orders dismissing certain claims asserted by Plaintiffs and ultimately granting summary judgment as to all of Plaintiffs' remaining claims. *See Value Health Sols.*, 2020 NCBC LEXIS 65, at *37–39; *Value Health Sols.*, 2021 NCBC LEXIS 37, at *83–84.

4. On 23 October 2021, Plaintiffs appealed this Court's rulings to the North Carolina Supreme Court. (ECF No. 153.)

5. On 21 September 2023, the Supreme Court affirmed all but one of this Court's rulings. Specifically, the Supreme Court reversed this Court's entry of summary judgment against Plaintiffs on the issue of PRA's alleged breaches of Sections 2.6(a)(iv)–(vii) and 2.6(b) of the parties' Asset Purchase Agreement ("APA," ECF No. 201.1) (the "Remanded Claim") and remanded that claim for further proceedings. *See Value Health Sols.*, 385 N.C. at 282–83.

6. Section 2.6(a) of the APA provides for a series of seven "Milestones," each of which corresponds to PRA's completion of either (i) a particular phase of its efforts to fully integrate PSO into its existing internal systems (the "Internal Development Milestones") in the aftermath of the Acquisition; or (ii) "External Sales" of PSO to third parties at various defined dollar amounts (the "External Sales Milestones"). Upon the completion of each Milestone, PRA was required to pay VHS a specified amount in accordance with the terms of that Milestone. (APA § 2.6(a).)

7. Section 2.6(a) of the APA reads as follows:

(a) <u>Milestones</u>. As additional consideration for the transactions contemplated hereby, and subject to the terms of this <u>Section 2.6</u>, [PRA] shall make (or [PRA Health Sciences] shall make on [PRA's] behalf) the following payments (each, a "<u>Contingent Payment</u>"):

i.      upon completion of the integration of the parties' Salesforce™ environments set forth on <u>Schedule 2.6(a)(i)</u>, [PRA] shall issue to [VHS] (or as otherwise directed by [VHS's] Representative), within thirty (30) days after such completion, that number of shares of PRA Common Stock equal in value to Three Hundred Thirty-Three Thousand U.S. Dollars ($333,000.00), based on the Fair Market Value as of the date of issuance of such shares; <u>provided</u>, <u>however</u>, that completion occurs within the first consecutive eighteen (18) months from the Effective Time (the "<u>Integration Period</u>");

ii.     upon completion of the key product enhancements set forth on <u>Schedule 2.6(a)(ii)</u>, [PRA] shall issue to [VHS] (or as otherwise directed by [VHS's] Representative), within thirty (30) days after such completion, that number of shares of PRA Common Stock equal in value to Three Hundred Thirty-Three Thousand U.S. Dollars ($333,000.00), based on the Fair Market Value as of the date of issuance of such shares; <u>provided</u>, <u>however</u>, that completion occurs within the Integration Period;

iii.    upon completion of the migration of the clinical trial management systems studies of [PRA] and its Affiliates into ClinTrial Max as set forth on <u>Schedule 2.6(a)(iii)</u>, [PRA] shall issue to [VHS] (or as otherwise directed by [VHS's] Representative), within thirty (30) days after such completion, that number of shares of PRA Common Stock equal in value to Three Hundred Thirty-Three Thousand U.S. Dollars ($333,000.00), based on the Fair Market Value as of the date of issuance of such shares; <u>provided</u>, <u>however</u>, that completion occurs within the Integration Period;

iv.    upon the achievement of aggregate External Sales equal to Twenty[-]Five Million U.S. Dollars ($25,000,000), [PRA] shall make, within thirty (30) days following the date on which [PRA] files its next quarterly report with the United States Securities and Exchange Commission (the "<u>SEC</u>") after such achievement, a cash payment of Two Million Five Hundred Thousand U.S. Dollars ($2,500,000.00) to [VHS] (or as otherwise directed by [VHS's] Representative) (the "<u>First Milestone Payment</u>"); <u>provided</u>, <u>however</u>, that such achievement occurs prior to the second (2nd) anniversary of the Closing Date (the "<u>First Milestone Period</u>");

v. upon the achievement of aggregate External Sales equal to Fifty Million U.S. Dollars ($50,000,000.00), [PRA] shall make, within thirty (30) days following the date on which [PRA] files its next quarterly report with the SEC after achievement, a cash payment of Five Million U.S. Dollars ($5,000,000.00) to [VHS] (or as otherwise directed by [VHS's] Representative) (the "Second Milestone Payment"); provided, however, that such achievement occurs prior to the third (3rd) anniversary of the Closing Date (the "Second Milestone Period");

vi. upon the achievement of aggregate External Sales equal to Seventy[-]Five Million U.S. Dollars ($75,000,000.00), [PRA] shall make, within thirty (30) days following the date on which [PRA] files its next quarterly report with the SEC after achievement, a cash payment of Seven Million Five Hundred Thousand U.S. Dollars ($7,500,000.00) to [VHS] (or as otherwise directed by [VHS's] Representative) (the "Third Milestone Payment"); provided, however, that such achievement occurs prior to the fourth (4th) anniversary of the Closing Date (the "Third Milestone Period"); and

vii. for four (4) consecutive calendar years following the achievement of aggregate External Sales equal to Seventy-Five Million U.S. Dollars ($75,000,000.00) (the "Major Milestone", and the date on which the Major Milestone is achieved, the "Major Milestone Date"), [PRA] shall make, within thirty (30) days following the date on which [PRA] files its next quarterly report with the SEC after each of the four (4) anniversaries of the Major Milestone Date, a per annum royalty payment to [VHS] (or as otherwise directed by [VHS's] Representative) equal to one percent (1%) of the aggregate amount of External Sales made during the applicable calendar year (such payments, the "Royalty Payments"). For the avoidance of doubt, any such Royalty Payments shall be made regardless of whether the First Milestone Payment, the Second Milestone Payment and/or the Third Milestone Payment have previously been made[.]

(APA §§ 2.6(a)(i)–(vii).)

8. Section 2.6(b) of the APA provides that each of the seven Milestones in Section 2.6(a) are independent and may not be conditioned upon one another. This provision reads as follows:

> [PRA's] obligation to pay the Contingent Payments to [VHS] (or as otherwise directed by [VHS's] Representative) in accordance with <u>Section 2.6(a)</u> is an independent obligation of [PRA] and is not otherwise conditioned or contingent upon the satisfaction of any conditions precedent to any preceding or subsequent Contingent Payment and the obligation to pay a Contingent Payment to [VHS] (or as otherwise directed by [VHS's] Representative) shall not obligate [PRA] to pay any preceding or subsequent Contingent Payment. For the avoidance of doubt and by way of example, if the conditions precedent to the payment of the First Milestone Payment for the First Milestone Period are not satisfied, but the conditions precedent to the payment of the Second Milestone Payment for the Second Milestone Period are satisfied, then [PRA] would be obligated to pay such Second Milestone Payment for the Second Milestone Period for which the corresponding conditions precedent have been satisfied, and not the First Milestone Payment for the First Milestone Period.

(APA § 2.6(b).)

9. On 26 October 2023, this Court entered a Supplemental Case Management Order, ("Suppl. CMO," ECF No. 166), which set forth parameters for additional discovery on certain issues identified by the Supreme Court with respect to the Remanded Claim. The Supplemental CMO also required the parties to seek leave of Court prior to filing any new motions for summary judgment. (Suppl. CMO ¶ (IV)(B)(4).)

10. After nearly a year of supplemental discovery, Defendants filed a motion seeking such authorization on 14 October 2024, ("Motion for Leave," ECF No. 199), in which they sought the Court's permission to file a motion for summary

judgment on three discrete issues.[2] The Court subsequently entered an Order granting the Motion for Leave on 27 January 2025. (ECF No. 211.)

11. On 24 February 2025, Plaintiffs filed the Motion to Strike, which requests that the Court enter an order striking Defendants' affirmative defense based on the statute of limitations, which—as discussed in more detail below—serves as one of the bases for Defendants' Motion for Summary Judgment.

12. Defendants filed the Motion for Summary Judgment on 10 March 2025.

13. First, Defendants seek partial summary judgment on the issue of whether the statute of limitations bars Plaintiffs from asserting that PRA breached Section 2.6(b) of the APA by improperly conditioning completion of "External Sales" of PSO upon satisfaction of one or more of the APA's Internal Development Milestones.

14. Second, Defendants argue that they are entitled to summary judgment on the issue of whether an agreement signed between PRA and a third-party, Takeda Pharmaceuticals ("Takeda")—the Takeda Master Services Agreement ("Takeda MSA," ECF No. 221.6)—constituted an "External Sale" under the APA.

15. Third, Defendants seek summary judgment on the issue of whether PRA's internal use of PSO to perform clinical trial services for its customers constitutes an "External Sale" under the APA.

---

[2] One of these issues was based on Defendants' contention that a portion of Plaintiffs' claim for breach of Section 2.6(b) was barred by the statute of limitations.

16.     Both Motions have now been fully briefed and came on for a hearing on 24 June 2025 at which all parties were represented by counsel.  The Motions are now ripe for resolution.

**LEGAL STANDARD**

17.     It is well established that "[s]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018) (quoting N.C. R. Civ. P. 56(c)).  "[A] genuine issue is one which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (cleaned up).

18.     On a motion for summary judgment, "[t]he evidence must be considered 'in a light most favorable to the non-moving party.'" *McCutchen v. McCutchen*, 360 N.C. 280, 286 (2006) (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470 (2004)).  "[T]he party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985).

19.     The party moving for summary judgment may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot

be proven at trial, or would be barred by an affirmative defense, . . . or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000). "If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Lowe v. Bradford*, 305 N.C. 366, 369–70 (1982) (quoting N.C. R. Civ. P. 56(e)). If the nonmoving party does not satisfy its burden, then "summary judgment, if appropriate, shall be entered against [the nonmovant]." *United Cmty. Bank (Ga.) v. Wolfe*, 369 N.C. 555, 558 (2017) (quoting N.C. R. Civ. P. 56(e)).

20. Rule 12(f) provides that a court "may order stricken from any pleading any insufficient defense[.]" N.C. R. Civ. P. 12(f). The purpose of the Rule is to "avoid expenditure of time and resources before trial by removing spurious issues, whether introduced by original or amended complaint." *Estrada v. Jaques*, 70 N.C. App. 627, 642 (1984). Ultimately, a motion to strike "is addressed to the sound discretion of the trial court[.]" *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 25 (2003).

## ANALYSIS

### I. Statute of Limitations

21. Defendants contend that Plaintiffs' claim for breach of Section 2.6(b) of the APA is barred, in part, by the applicable statute of limitations.

22. As an initial matter, Plaintiffs argue that Defendants' invocation of the statute of limitations as an affirmative defense should be stricken on the ground that the defense was not pled with the requisite specificity. *See* N.C. R. Civ. P. 8(c)

(pleadings of affirmative defenses must contain "a short and plain statement of any matter constituting an avoidance or affirmative defense sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved").

23. A Rule 12(f) motion to strike tests "the legal sufficiency of an affirmative defense," and "the requirements for pleading a defense are no more stringent than the requirements for pleading a claim for relief." *Lineage Logistics, LLC v. Primus Builders, Inc.*, 2024 NCBC LEXIS 31, at \*\*9 (N.C. Super. Ct. Feb. 23, 2024) (cleaned up).

24. Defendants first asserted the statute of limitations defense in their Answer filed on 2 December 2019 by stating: "Some or all of Plaintiffs' claims are barred by the statute of limitations, including Plaintiffs' fraud-based claims." (ECF No. 76, at 15.)

25. Plaintiffs argue that this statement—by itself—did not provide them with sufficient notice of Defendants' intent to raise the statute of limitations because it is "a single, conclusory sentence, devoid of facts." (Pls.' Br. Supp. Mot. Strike, at 4, ECF No. 215.)

26. Although the better practice would have been for Defendants to provide more detail in their affirmative defense as to how specifically the statute of limitations affected Plaintiffs' claims, we note that our Court of Appeals has held (albeit in an unpublished opinion) that a similarly succinct articulation of a statute of limitations defense satisfied North Carolina's notice pleading standard. *See Babb*

*v. Graham*, 2005 N.C. App. LEXIS 1219, at *22 (2005) (unpublished). In *Babb*, the Court of Appeals determined that the bare assertions that "'the application of the Statute of Limitations . . . would serve as a bar to any of' the claims against [defendant]" and that "any other claims against [defendant] were 'barred by the applicable' statutes of limitations" sufficed to "put the parties on notice that the timing of the potential claims was an issue." *Id.*

27.     Moreover, under the circumstances presented in this case, the Court is unable to find that Plaintiffs will be unfairly prejudiced if Defendants are allowed to pursue this defense. After all, Plaintiffs have been on notice of this defense for over five years.[3] During those years, Plaintiffs never put Defendants on notice of their contention that the defense had been insufficiently pled so as to give Defendants an opportunity to seek leave of court to amend their pleading to provide more specificity.

28.     For these reasons, Plaintiffs' Motion to Strike is **DENIED**, and the Court now turns to the merits of Defendants' summary judgment argument on this issue.[4]

29.     The relevant limitations period for a breach of contract claim is three years. *Sparrow Sys. v. Priv. Diagnostic Clinic, PLLC*, 2014 NCBC LEXIS 70, at *31 (N.C. Super. Ct. Dec. 24, 2014) ("In general, an action for breach of contract must be

---

[3] Additionally, the issue was fully briefed before the Supreme Court, although the Supreme Court ultimately opted not to rule on that issue.

[4] For these same reasons, Plaintiffs' request for judgment on the pleadings on this issue pursuant to Rule 12(c) is also **DENIED**.

brought within three years from the time of the accrual of the cause of action." (cleaned up)); *see also* N.C.G.S. § 1-52(1).

30. "[The] statute of limitations does not begin to run until the plaintiff has actual or constructive notice of the defendants' wrongful acts." *Trail Creek Invs. LLC v. Warren Oil Holding Co.*, 2023 NCBC LEXIS 70, at **25 (N.C. Super. Ct. May 9, 2023).

31. Defendants contend that Raja first learned of Defendants' efforts to improperly condition the External Sales Milestones (instead of immediately seeking to pursue External Sales of PSO following the Acquisition) through a conversation he had with PRA's Chief Executive Officer, Colin Shannon, back in June 2015.

32. Raja testified that, during this conversation, Shannon told him: "Neil, let's just focus on getting [PSO] internally done, you know, smoke tested, and then we will go sell it, just focus on that." (2019 VHS Dep., at 79, ECF No. 201.11.)

33. According to Raja, this comment "made [it] clear" that Shannon "want[ed] . . . to focus internally" and "to stop external sales [of PSO] until [PRA went] live with [PSO]." (Raja Dep., at 294, ECF No. 221.1.)

34. In explaining his comments, Shannon testified that he was aware of "substantial gaps" in PSO's initial capabilities and believed that PRA needed PSO to be fully integrated into PRA's own systems "first so that [PRA] could then take it to market." (Shannon Dep., at 93, ECF No. 221.3.)[5]

---

[5] When asked whether he thought "it was reasonable for [Raja] to believe [that] he could start selling VHS's software solutions from the moment he joined PRA[,]" Shannon testified that "[i]t would have been very foolhardy for him to ever think that. [PRA] could have been sued.

35. Raja testified that he was "shocked" at the news of this "bombshell" from Shannon, which he interpreted to mean that "[external] sales milestones [could not] be pursued until [the] internal milestones [were] done[.]" (2019 VHS Dep., at 79, 175.) Nevertheless, Raja continued to believe that External Sales of PSO were achievable and that PSO was an "essential" component to PRA's upcoming transaction with Takeda. (*See* Pls.' Resp. Defs.' Mot. Summ. J., Ex. U, ECF No. 125.22; Shannon Dep., at 110–13, ECF No. 229.2; Raja Dep., at 345–48, ECF No. 229.4; Jones-Herzog Dep., at 188–96, ECF No. 229.5.) Likewise, Raja testified that he felt PRA was cooperating with him during this time period by actively making efforts to amend the APA's milestones. (Raja Dep., at 334–40, 345–48, ECF No. 229.4.)

36. The Court is of the view that to the extent Shannon's June 2015 comments to Raja were sufficient to give rise to a claim for breach of PRA's obligations under Section 2.6(b) at that time, the claim would be based on a theory of anticipatory repudiation.

37. The parties disagree over whether North Carolina law or Delaware law should govern the Court's analysis on the statute of limitations issue. Plaintiffs assert that because Delaware's substantive laws apply to the breach of contract claim,[6] the laws of that state should also govern the issue of determining when

---

[PRA's] reputational damage would have been enormous if [it] installed something that [did] not meet the needs [of its customers]." (Shannon Dep., at 109.)

[6] Section 8.7 of the APA provides that the agreement "shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware without giving effect to the principles of conflicts of law thereof." (APA § 8.7.)

Plaintiffs' cause of action accrued for purposes of the statute of limitations. Defendants, conversely, assert that because the statute of limitations is properly characterized as procedural rather than substantive, North Carolina law should apply to that issue.

38. However, the Court need not address the choice-of-law issue because the laws of North Carolina and Delaware are essentially identical concerning anticipatory repudiation.

39. North Carolina courts define anticipatory repudiation as follows:

> Repudiation is a positive statement by one party to the other party indicating that he will not or cannot substantially perform his contractual duties. When a party repudiates his obligations under the contract before the time for performance under the terms of the contract, the issue of anticipatory breach or breach by anticipatory repudiation arises. One effect of the anticipatory breach is to discharge the non-repudiating party from his remaining duties to render performance under the contract.

*Profile Invs. No. 25, LLC v. Ammons E. Corp.*, 207 N.C. App. 232, 236 (2010) (cleaned up).

40. Our Court of Appeals has provided further illustration regarding the applicability of this doctrine.

> [E]ven a distinct, unequivocal, and absolute refusal to perform is not a breach unless it is treated as such by the adverse party. Upon repudiation, the non-repudiating party may at once treat it as a breach of the entire contract and bring his action accordingly. Thus, breach by repudiation depends not only upon the statements and actions of the allegedly repudiating party but also upon the response of the non-repudiating party.

*Id.* at 237 (cleaned up).

41.     Similarly, the Delaware Court of Chancery has stated the following regarding the anticipatory repudiation of a contract:

> A repudiation of a contract is an outright refusal by a party to perform a contract or its conditions.  Repudiation may be accomplished through words or conduct. A party may repudiate an obligation through statements when its language, reasonably interpreted, indicates that it will not or cannot perform; alternatively, a party may repudiate through a voluntary and affirmative act rendering performance apparently or actually impossible.  In any event, repudiation must be positive and unconditional. An attempt to renegotiate terms will not constitute repudiation absent an unqualified refusal to perform unless the non-repudiating party accedes.

> A party confronted with repudiation may respond by (i) electing to treat the contract as terminated by breach, (ii) by lobbying the repudiating party to perform, or (iii) by ignoring the repudiation.  Although perhaps counterintuitive, whether repudiation amounts to a present breach is predicated on the promisee's response.  Unless the non-repudiating party relies upon the repudiation or notifies the promisor that it considers the repudiation final, the promisor may retract his repudiation, thereby returning the parties to the status quo ante.  Once the promisee relies on the repudiation--e.g., by filing suit for damages or by engaging in a substitute transaction--or notifies the promisor it regards the [repudiation] as final, effective retraction is no longer possible.

*West Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 Del. Ch. LEXIS 23, at *14–15 (Del. Ch. Feb. 23, 2009) (cleaned up).

42.     But even assuming that Shannon's statements to Raja constituted the type of "unequivocal" and "absolute" refusal to perform sufficient to invoke the anticipatory repudiation doctrine, it is clear that Plaintiffs elected not to treat Shannon's statements as an anticipatory repudiation of the APA and instead continued to both perform under—and seek amendments to—the agreement.

43.     Thus, regardless of whether North Carolina or Delaware law applies, Plaintiffs' failure to treat Shannon's statements as an unconditional breach precludes

a finding of anticipatory repudiation. *See Profile Invs. No. 25, LLC,* 207 N.C. App. at 237 ("[E]ven a distinct, unequivocal, and absolute refusal to perform is not a breach unless it is treated as such by the adverse party." (cleaned up)); *West Willow-Bay Ct., LLC*, 2009 Del. Ch. LEXIS 23, at *15 ("[W]hether repudiation amounts to a present breach is predicated on the promisee's response.").

44. Therefore, the Court is unable to conclude as a matter of law that Plaintiffs' claim accrued in June 2015 as a result of Shannon's comments.

45. Instead, the Court finds that significant questions of fact remain as to the date upon which Plaintiffs' claim for breach of Section 2.6(b) accrued for statute of limitations purposes. *See Chisum v. Campagna,* 376 N.C. 680, 699–702 (2021) (affirming trial court's submission to jury of question as to when statute of limitations began to run).

46. Accordingly, PRA's Motion for Summary Judgment based on the statute of limitations is **DENIED**.[7]

## II. Takeda MSA as an External Sale Under the APA

47. In connection with Plaintiffs' appeal to the Supreme Court in this case, the parties debated whether the MSA between PRA and Takeda constituted an "External Sale" under the APA (such that PRA was required to credit the transaction towards the APA's External Sales Milestones).

48. The APA defines an "External Sale" as follows:

---

[7] In light of the Court's ruling, it need not address Plaintiffs' alternative arguments regarding the applicability of equitable tolling or the prevention doctrine to defeat summary judgment based upon Defendants' statute of limitations defense.

"External Sale" means the sale of one or more licenses to [PSO] by [PRA] or one of its Affiliates to a third party which is not (i) an Affiliate of [PRA] or (ii) using such license(s) in connection with providing services to [PRA] and/or any of its Affiliates.

(APA, Ex. A.)

49.     Section 7.02(b) of the Takeda MSA states as follows:

(b) License to PRA[] Owned Technology During the Term. As of the Commencement Date and for the remainder of the Term, PRA[] hereby grants Takeda, Takeda Affiliates and their respective Personnel and third party service providers the right to access and use PRA[] Owned Technology used in supporting or providing the Services for purposes of receipt and use of the Services in the conduct of Takeda's and Takeda Affiliates' business. For the avoidance of doubt, the foregoing right is granted under all PRA[] Owned IP and includes the right to use all the configuration capabilities offered by the PRA[] Owned Technology.[8]

(Takeda MSA § 7.02(b).)

---

[8] The Takeda MSA defines "PRA[] Owned Technology" as follows:

"PRA[] Owned Technology" means (i) all confidential or proprietary processes, procedures, methodologies, standard operating procedures, software, templates, programs and other protectable materials that are used generally by PRA[] in PRA[]'s business, but excluding any that are specifically created for or resulting from a Study or relate to a Study Drug or any other Takeda Product or that otherwise constitute or are based on Takeda Owned IP, regardless of whether such materials or any portion thereof are used in connection with PRA[]'s performance under this Agreement or the applicable Site Agreement, and (ii) derivative works, modifications and enhancements to any of the foregoing, but excluding any that are specifically created for or resulting from a Study or a Study Drug or any other Takeda Product or that otherwise constitute or are based on Takeda Owned IP, regardless of whether such materials or any portion thereof are used in connection with PRA[]'s performance under this Agreement or the applicable Site Agreement; and (iii) any form of delivery for (i) or (ii) received as part of the Services, such as via Cloud Computing.

(Takeda MSA, Ex. 1, at 8.)

50. PRA is listed as the licensor of PSO in Exhibit 18 to the Takeda MSA. (Takeda MSA, Ex. 18.)

51. In its opinion, the Supreme Court stated the following with respect to how to apply the APA's definition of "External Sale" to the Takeda MSA:

> The Takeda MSA closely mirrors the APA definition of "External Sale." As part of a bundle including the use of the software and providing services to Takeda, and in exchange for a price of approximately $491 million over a term of years, PRA transferred a license to Takeda; Takeda is neither an affiliate of PRA nor providing a service to PRA.

> Defendants appear to be arguing that they have excluded the transaction with Takeda from the APA definition of "External Sale" by simply bundling the transfer of the license as part of a service package and by not including an invoice line item of the license. This interpretation is unreasonable and produces an absurd result. *Manti Holdings, LLC*, 261 A.3d at 1208.

> Moreover, defendants could have contracted around the issue of a line-item requirement if such a carve out was truly an intended part of the bargain. In the APA, defendants excluded from the realm of "External Sale" "(i) an Affiliate of [PRA] or (ii) using such licenses in connection with providing services to *[PRA]* and/or any of its Affiliates." (Emphasis added.) The parties could have included a third carve out: "(iii) license bundled within a software as a service agreement in connection with PRA providing services *to a third-party*." *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 816 (Del. 2013) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del. 2004). Defendants did not do so. Furthermore, defendants' own expert witness, Bryan Haas, testified that "software as a service is not always a license. Sometimes it's just that you have access to use [it]." It seems that a license did not necessarily have to be issued to provide this service to Takeda. Nevertheless, PRA issued a license to Takeda and called it a license in the MSA.

> To be sure, this Court is not suggesting that if PRA were to simply refuse to use the term "license" for a transfer of software that it would be excluded from the definition of "External Sale." Instead, what this Court is saying is that, here, in this circumstance, the Takeda MSA specifically included, for a price, the transfer of a license to use the "PRA[ ] Owned Technology." What is unknown is whether the Takeda MSA was drafted

such that Takeda was required to pay consideration to acquire and use a license of the [PSO]. Therefore, defendants' failure to pay for the transfer of the license to Takeda under the MSA, as required by the APA, may be a breach of contract.

We hold that the Takeda contract could be an "External Sale."  This Court remands this issue to the trial court to determine whether the Takeda MSA was drafted such that Takeda was required to pay consideration to acquire and use a license of the [PSO] . . . . On remand the trial court may find there is a need for additional discovery to determine if there are other external contracts that include transfer of licenses to the [PSO], either in effect, or that were specifically termed as such and which required consideration in exchange for the [PSO].

*Value Health Sols., Inc.*, 385 N.C. at 273–74.

52.     Pursuant to the Supreme Court's directive, this Court, on remand, allowed the parties to take supplemental discovery on the following topic:

Whether the Takeda MSA was drafted such that Takeda was required to pay consideration to acquire and use a license of [PSO], thereby rendering the Takeda contract an "External Sale," along with any potentially recoverable damages arising therefrom.  Relatedly, whether PRA has executed any other customer contracts that include the transfer of licenses to [PSO], either in effect, or that were specifically termed as such, and which required the payment of consideration in exchange for [PSO], whether such payment was specifically termed a payment wholly or partially in exchange for [PSO] or effectively served as such a payment albeit not so specifically termed, along with any potentially recoverable damages arising therefrom.

(Suppl. CMO § (IV)(A)(5)(b).)

53.     The supplemental discovery conducted by the parties included, without limitation, the deposition of a Takeda representative, Elizabeth Lyskanowski, and the production of various "Statements of Work" ("SOWs") detailing specific tasks that PRA performed for Takeda pursuant to the Takeda MSA.[9]

---

[9] Although the Takeda MSA was the only Takeda-specific document referenced by the Supreme Court in its opinion, the MSA provided that "each clinical trial or study that Takeda

54. The Court's review of the above-referenced testimony and the documents of record have failed to reveal any evidence whatsoever suggesting that the "MSA was drafted such that Takeda was required to pay consideration to acquire and use a license of [PSO]." *Value Health Sols., Inc.*, 385 N.C. at 274.

55. There are only two isolated references to PSO within the hundreds of pages that comprise the SOWs, and those references do not appear in connection with any form of payment or consideration by Takeda to PRA. (ECF No. 221.18, at 36–37.)

56. Lyskanowski's deposition testimony further confirms that there was never any intention by either Takeda or PRA for consideration to be paid in exchange for a license in PSO. (*See, e.g.*, Lyskanowki Dep., at 38, 69–70, ECF No. 201.6, Lyskanowski Dep., at 36, 69–71, 74, ECF No. 221.7.)

57. In response to Defendants' Motion for Summary Judgment, Plaintiffs did not offer any evidence to the contrary. Indeed, at the 24 June hearing on the Motions, Plaintiffs' counsel conceded that there is no evidence showing that Takeda was required to pay consideration in exchange for a license to acquire and use PSO.

58. For these reasons, the Court **GRANTS** summary judgment for PRA on the issue of whether the Takeda MSA constitutes an External Sale under the APA.

---

sought to have PRA perform—including the tasks to be performed and the cost associated with each particular task—would be defined in a separate" SOW. (Defs.' Br. Supp. Mot. Summ. J. and Partial Summ. J. Pursuant Rule 56(B), at 6, ECF No. 219.)

### III. PRA's Internal Use of PSO as External Sales

59. Finally, PRA seeks summary judgment in its favor on the issue of whether PRA's purely *internal* use of PSO constituted an External Sale under the APA. Specifically, PRA seeks clarification in the form of a ruling from the Court that no External Sales occurred as defined in the APA in situations where PRA *itself* used PSO to conduct in-house clinical research for customers—that is, contracts that did *not* include a transfer of a license for PSO by PRA to the customer.

60. In its opinion, the Supreme Court made clear that in order for an External Sale to have occurred under the APA, a contract between PRA and its customer must have included a transfer of a license for the customer to use PSO. *Value Health Sols., Inc.*, 385 N.C. at 273–74.

61. As Plaintiffs' counsel concedes, under circumstances where no license was conveyed, the Supreme Court's definition of External Sale would not be satisfied.

62. Accordingly, summary judgment is **GRANTED** as to the issue of whether these in-house clinical trials constituted External Sales under the APA.

### CONCLUSION

**THEREFORE,** it is **ORDERED** as follows:

i. Plaintiffs' Motion to Strike is **DENIED**.

ii. Defendants' Motion for Summary Judgment is **GRANTED** as to the following issues:

  a. Whether the Takeda MSA constitutes an External Sale under the APA; and

b. Whether PRA's internal use of PSO for in-house clinical trials constituted an External Sale under the APA in the absence of a transfer of a license for PSO to the customer.

iii. Defendants' Motion for Summary Judgment is **DENIED** as to the following issue:

a. Whether the statute of limitations serves to bar any portion of Plaintiffs' claim for breach of Section 2.6(b) regarding PRA's allegedly improper conditioning of the External Sales upon the completion of the APA's Internal Development Milestones.

**SO ORDERED**, this the 23rd day of July, 2025.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge
for Complex Business Cases